# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 28, 2020    Decided August 7, 2020

No. 19-5331

COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,
APPELLEE

v.

DONALD F. MCGAHN, II,
APPELLANT

———

On Petition for Rehearing En Banc

———

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With him on the brief were *Mark R. Freeman* and *Michael S. Raab*, Attorneys.

*Douglas N. Letter,* General Counsel, and *Megan Barbero*, Deputy General Counsel, U.S. House of Representatives, argued the cause for appellee. With them on the brief were *Todd B. Tatelman*, Principal Deputy General Counsel, *Josephine Morse*, Deputy General Counsel, *Adam A. Grogg* and *William E. Havemann,* Associate General Counsel, *Jonathan B. Schwartz*, Attorney, *Annie L. Owens*, *Joshua A. Geltzer*, and *Matthew S. Hellman.*

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Ashwin P. Phatak* were on the brief for *amici curiae* Former Department of Justice Officials in support of appellee.

*Irvin B. Nathan*, *John A. Freedman*, *Andrew T. Tutt*, and *Samuel F. Callahan* were on the brief for *amici curiae* Former Members of Congress in support of appellee.

*Andrew D. Herman* was on the brief for *amici curiae* the Lugar Center and the Levin Center at Wayne Law in support of appellee.

*Dwayne D. Sam* and *David Bookbinder* were on the brief for *amicus curiae* Niskanen Center in support of appellee.

*Kelsi Brown Corkran*, *Benjamin F. Aiken*, and *Sarah H. Sloan* were on the brief for *amici curiae* Professors Jonathan R. Nash, et al. in support of appellee.

*Michael J. Miarmi* and *Rhea Ghosh* were on the brief for *amici curiae* Nixon Impeachment Scholars in support of appellee.

*Katharine M. Mapes* was on the brief for *amicus curiae* Morton Rosenberg in support of appellee.

*Lawrence S. Robbins*, *D. Hunter Smith*, and *Megan Browder* were on the brief for *amici curiae* Former General Counsels of the U.S. House of Representatives in support of appellee.

Before: SRINIVASAN, *Chief Judge*, HENDERSON, ROGERS, TATEL, GARLAND, GRIFFITH, MILLETT, PILLARD, WILKINS, KATSAS[*], and RAO[*], *Circuit Judges*.

Opinion of the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* HENDERSON.

Dissenting opinion by *Circuit Judge* GRIFFITH.

ROGERS, *Circuit Judge*: The question before the *en banc* court is whether the Committee on the Judiciary of the House of Representatives has standing under Article III of the Constitution to seek judicial enforcement of its duly issued subpoena. Upon applying the principles of Article III standing, we hold that it does.

The Constitution charges Congress with certain responsibilities, including to legislate, to conduct oversight of the federal government, and, when necessary, to impeach and remove a President or other Executive Branch official from office. Possession of relevant information is an essential precondition to the effective discharge of all of those duties. Congress cannot intelligently legislate without identifying national problems in need of legislative solution and relying on testimony and data that provide a deeper understanding of those problems, their origins, and potential solutions. It likewise cannot conduct effective oversight of the federal government without detailed information about the operations of its departments and agencies. And it cannot undertake impeachment proceedings without knowing how the official in

---

[*] Judge Katsas and Judge Rao did not participate in this matter.

question has discharged his or her constitutional responsibilities.

The Committee, acting on behalf of the full House of Representatives, has shown that it suffers a concrete and particularized injury when denied the opportunity to obtain information necessary to the legislative, oversight, and impeachment functions of the House, and that its injury would be redressed by the order it seeks from the court. The separation of powers and historical practice objections presented here require no different result. Indeed, the ordinary and effective functioning of the Legislative Branch critically depends on the legislative prerogative to obtain information, and constitutional structure and historical practice support judicial enforcement of congressional subpoenas when necessary.

## I.

In March 2019, the House Judiciary Committee ("the Committee") began an investigation into alleged misconduct by President Trump and his close advisors. *See* H. REP. NO. 116-105, at 13 (2019). Its investigation followed upon publication of the report of Special Counsel Robert S. Mueller. *See* ROBERT S. MUELLER, III, REPORT ON THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION (2019). During his investigation, the Special Counsel interviewed Donald F. McGahn, II, then serving as White House Counsel. In declining to exonerate the President, the Special Counsel explained that the Office of Legal Counsel ("OLC") in the Department of Justice had opined that indicting or criminally prosecuting a sitting President would violate the separation of powers. *See id.*, vol. II at 1. The Special Counsel's Report accordingly concluded that impeachment would be the mechanism to address whether President Trump

impermissibly coordinated with the Russian government in connection with the 2016 Presidential election or obstructed justice in the course of the Special Counsel's investigation. *See id.* The Committee's investigation responded to this conclusion.

The Committee's interest in McGahn's testimony therefore arose in furtherance of the "sole Power of Impeachment" vested in the House of Representatives under Article I, section 2, clause 5 of the Constitution, and included consideration of the amendment or enactment of laws on ethical conduct by Executive Branch officials and oversight of the Department of Justice ("the Department") and the Federal Bureau of Investigation to determine if they were operating with requisite independence. Memorandum from Hon. Jerrold Nadler, Chairman, Comm. on the Judiciary, U.S. House of Representatives, to Members of the Committee, at 4–8 (July 11, 2019) (hereinafter "Nadler Memorandum"); H. REP. NO. 116-346, at 132–34, 159–60 & n.928 (2019); H. REP. NO. 116-105, at 13. The Committee requested that McGahn turn over documents related to the President's alleged obstruction of the Special Counsel's investigation. His testimony would, in turn, inform the Committee's determination of whether President Trump had committed impeachable offenses in obstructing the Special Counsel's investigation and whether to recommend articles of impeachment. McGahn's testimony would also inform House oversight and legislative functions in determining the need for legislation to protect federal law enforcement investigations from improper political interference. Nadler Memorandum at 4–8; H. REP. NO. 116-346, at 132–34, 159–60 & n.928; H. REP. NO. 116-105, at 13.

When McGahn, then no longer White House Counsel, declined these requests, the Committee issued a subpoena on April 22, 2019, ordering McGahn to appear at a May 21, 2019,

hearing to testify and to produce the requested documents. On May 20, McGahn's successor as White House Counsel informed the Committee that the President had "directed Mr. McGahn not to appear at the Committee's scheduled hearing" because the OLC had opined that close Presidential advisors were "absolutely immune from compelled congressional testimony." Letter from Pat A. Cipollone, White House Counsel, to Hon. Jerrold Nadler, Chairman, Comm. on the Judiciary, U.S. House of Representatives, at 1–2 (May 20, 2019). McGahn's private counsel confirmed that he would not appear. Letter from William A. Burck to Hon Jerrold Nadler, Chairman, Comm. on the Judiciary, U.S. House of Representatives, at 1 (May 20, 2019).

Although agreement was ultimately reached on the production of the subpoenaed documents, McGahn repeatedly rejected the Committee's continuing offers of accommodations in attempting to secure his testimony. Finally, impasse having been reached, the Committee, as authorized by the House of Representatives in H. RES. 430, 116th Cong. (2019), filed suit in the federal district court on August 17, 2019, to enforce its subpoena. The complaint sought a declaratory judgment "that McGahn's refusal to appear before the Committee in response to the subpoena issued to him was without legal justification" and an injunction "ordering McGahn to appear and testify forthwith before the Committee" "as to matters and information discussed in the Special Counsel's Report and any other matters and information over which executive privilege has been waived or is not asserted." Compl. at 53. The Department of Justice has represented McGahn in this litigation.

The district court, in response to the parties' cross-motions for summary judgment, ruled that the Committee had both standing and a cause of action to enforce its subpoena, and that

the court had subject matter jurisdiction over the lawsuit. On the merits, the district court rejected McGahn's claim of absolute immunity from a congressional subpoena and directed him to appear before the Committee. Because McGahn might be entitled to withhold certain information on the basis of recognized privileges, the district court clarified that the injunction required McGahn only to appear before the Committee, not necessarily to answer any questions. *Comm. on the Judiciary, U.S. House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 214–15 (D.D.C. 2019).

Upon McGahn's appeal, a divided three-judge panel of this court held that the Committee lacked Article III standing because of separation-of-powers principles and historical practice. *Comm. on the Judiciary, U.S. House of Representatives v. McGahn*, 951 F.3d 510 (D.C. Cir. 2020). The court granted the Committee's petition for *en banc* review to consider whether the Committee has standing to seek enforcement of its subpoena in federal court. Order at 2 (Mar. 13, 2020).

## II.

Article III of the Constitution vests in the federal judiciary "[t]he judicial power of the United States," U.S. CONST. art. III, § 1, which extends to "[c]ases" and "[c]ontroversies," *id.* § 2. "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing inquiry is "[t]rained on whether the plaintiff is [a] proper party to bring [a particular lawsuit]." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (second and third alterations in original) (quoting *Raines*, 521 U.S. at 818). It "limits the category of

litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo v. Robbins*, 136 S. Ct. 1540, 1547 (2016). When determining whether a plaintiff has Article III standing, the court must assume that the Committee will prevail on the merits. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Estate of Boyland v. U.S. Dep't of Agriculture*, 913 F.3d 117, 123 (D.C. Cir. 2019). Because "reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the court's standing inquiry must be "especially rigorous." *Raines*, 521 U.S. at 819–20. Our analysis reflects that rigor.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* At issue is injury in fact, "the '[f]irst and foremost' of standing's three elements." *Id.* (alteration in original) (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). These are distinct requirements: in addition to being actual or imminent, "an injury in fact must be both concrete *and* particularized." *Id.*

The Supreme Court has confirmed that these general principles of standing apply to institutional injuries claimed by legislative bodies. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652

(2015), the Supreme Court held that the Arizona State Legislature had standing to challenge as unconstitutional a ballot provision that vested redistricting authority in an independent agency. *See id.* at 2665–66. Analyzing whether the legislature had demonstrated standing, the Court invoked its familiar standing test. *See id.* at 2663. An institutional body seeking to demonstrate standing "'must show, first and foremost,' injury in the form of '"invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent."'" *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)). The first element of the test, injury in fact, thus applies to a legislative body seeking to demonstrate standing. The remainder of the test also applies: "[t]he Legislature's injury must also be 'fairly traceable to the challenged action' and 'redressable by a favorable ruling.'" *Id.* (quoting *Clapper*, 568 U.S. at 409).

We begin our analysis here, addressing these general principles of standing, before turning to the special considerations presented by the interbranch nature of this litigation. Ultimately, we hold that the Committee has Article III standing to protect against the denial of that to which it alleges it is entitled, namely McGahn's testimony in response to its duly issued subpoena. McGahn's disregard of the subpoena, the validity of which he has never challenged, deprived the Committee of specific information sought in the exercise of its constitutional responsibilities. The Committee is the "proper party" to bring this "particular lawsuit," *id.* Because the Committee's injury has been caused by McGahn's defiance of its subpoena and can be cured here only by judicial enforcement of the subpoena, the injury is traceable to McGahn's conduct and judicially redressable. And, contrary to McGahn's positions, the Committee's standing is consistent with the system of separated powers and capable of resolution

through the judicial process, *see Allen v. Wright*, 468 U.S. 727, 752 (1984).

**A.**

To be judicially cognizable and form the basis of Article III standing, an injury must be concrete, as opposed to abstract. A concrete injury is an injury that is real; it "must actually exist." *Spokeo*, 136 S. Ct. at 1548. "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize," the Supreme Court has acknowledged "that intangible injuries can nevertheless be concrete." *Id.* at 1549.

As to the concreteness of the Committee's alleged injury, the Supreme Court has acknowledged the essentiality of information to the effective functioning of Congress and long "held that each House has power 'to secure needed information'" through the subpoena power. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)). Because Congress must have access to information to perform its constitutional responsibilities, when Congress "does not itself possess the requisite information — which not infrequently is true — recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. Therefore, "the power of inquiry — with process to enforce it — is an essential and appropriate auxiliary to the legislative function." *Id.* at 174. "Without the power to investigate — including of course the authority to compel testimony, either through its own processes or through judicial trial — Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." *Quinn v. United States*, 349 U.S. 155, 160–61 (1955); *see Mazars*, 140 S. Ct. at 2031. That constitutional power entitles

each House to the testimony of a witness and production of requested documents in response to a lawful subpoena.

The subpoena power is potent. Each House of Congress is specifically empowered to compel testimony from witnesses and the production of evidence in service of its constitutional functions, and the recipient of a subpoena is obligated by law to comply.

> It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation.

*Watkins v. United States*, 354 U.S. 178, 187–88 (1957); *see Mazars*, 140 S. Ct. at 2036 (quoting *Watkins*, 354 U.S. at 187).

The power of each House of Congress to compel witnesses to appear before it to testify and to produce documentary evidence has a pedigree predating the Founding and has long been employed in Congress's discharge of its primary constitutional responsibilities: legislating, conducting oversight of the federal government, and, when necessary, checking the President through the power of impeachment. Congressional subpoenas have their historical basis in the "emergence of [the English] Parliament." *Watkins*, 354 U.S. at 188. Congress began using its investigative powers from the earliest days of the Republic to investigate national problems and probe for possible federal solutions. *See Mazars*, 140 S. Ct. at 2029–30. Yet "[t]he Nation was almost one hundred years old before the first case reached [the Supreme] Court to

challenge the use of compulsory process as a legislative device." *Watkins*, 354 U.S. at 193. In that case, *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the Supreme Court held that the House had "exceeded the limit of its own authority" by inquiring into a matter that "could result in no valid legislation on the subject to which the inquiry referred." *Id.* at 192, 195. Congress's power to issue subpoenas in conjunction with legislative investigations was confirmed by the Supreme Court in *McGrain*, 273 U.S. 135, and *Sinclair v. United States*, 279 U.S. 263 (1929). "Following these important decisions, . . . there was vigorous use of the investigative process by a Congress bent upon harnessing and directing the vast economic and social forces of the times." *Watkins*, 354 U.S. at 195.

Congress commonly uses subpoenas not only to develop legislation but also in furtherance of its oversight of the federal government, including the Executive Branch. This subpoena power "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Watkins*, 354 U.S. at 187. Subject to certain restraints, *see, e.g.*, *id.*, "[a] legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress," *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938). Indeed, the Court has recently emphasized that "[u]nless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *Mazars*, 140 S. Ct. at 2033 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)).

The House of Representatives employs its subpoena power in service of its constitutional power of impeachment, as the Committee's investigation illustrates. The Constitution vests in the House of Representatives the "sole Power of

Impeachment," U.S. CONST. art. I, § 2, cl. 5, and thereby empowers the House to set in motion a process that may result in the removal of the President from Office. To level the grave accusation that a President may have committed "Treason, Bribery, or other high Crimes and Misdemeanors," U.S. CONST. art. II, § 4, the House must be appropriately informed. And it cannot fully inform itself without the power to compel the testimony of those who possess relevant or necessary information. As far back as 1796, George Washington, the Nation's first President, acknowledged that the House may compel the President to turn over some Executive Branch information if sought as part of an impeachment investigation. *See* Pres. George Washington, *Message to the House Regarding Documents Relative to the Jay Treaty* (Mar. 30, 1796); *see Mazars*, 140 S. Ct. at 2029–30. Decades later, Congress also issued subpoenas to President Nixon during its impeachment investigation of him. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 726–27 (D.C. Cir. 1974).

The House, then, has a long-recognized right, based in the Constitution, to have McGahn appear to testify and produce documents. Because each House of Congress delegates its power of inquiry to its Committees, which are "endowed with the full power of Congress to compel testimony," *Watkins*, 354 U.S. at 201; HOUSE RULES X & XI, cl. 2(m)(1), the Committee exercised the House's subpoena power when it issued a subpoena to McGahn. By refusing to testify in response to the Committee's concededly valid subpoena, McGahn has denied the Committee something to which it alleges it is entitled by law. And because the Committee has alleged the deprivation of testimony to which it is legally entitled, its asserted injury is concrete.

In other contexts, as well, the Supreme Court has held that when a person seeks to obtain information the government is required to disclose, the denial of the information is a concrete injury for standing purposes. For example, in *FEC v. Akins*, 524 U.S. 11 (1998), the Court held that the plaintiffs had suffered an Article III injury "consist[ing] of their inability to obtain information . . . that, on their view of the law," they were legally entitled to. *Id.* at 21. Similarly, in *Public Citizen v. DOJ*, 491 U.S. 440 (1989), the Court held that plaintiffs incurred an injury sufficient to support standing when they were denied access to agency records to which they were legally entitled. *Id.* at 449. *Akins* and *Public Citizen* thereby support the principle that the denial of information to which the plaintiff claims to be entitled by law establishes a quintessential injury in fact. *See Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008). Here, each House of the Congress has a constitutionally grounded entitlement to obtain information, namely McGahn's testimony, in carrying out its constitutional functions. McGahn's denial of the information to which the Committee alleges it is entitled results in informational injury of the kind that the Supreme Court held supported standing in *Akins* and *Public Citizen*.

By analogy, private parties undeniably have standing to seek judicial enforcement of compliance with subpoenas. And Courts have regularly entertained lawsuits in which a legislative body seeks to enforce a subpoena against a private party. *See, e.g.*, *In re Application of Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232 (D.C. Cir. 1981); *Senate Select Comm.*, 498 F.2d 725; *Senate Permanent Comm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016). Further, the OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas. *See Response to Congressional Requests for Information Regarding Decisions Made Under the*

*Independent Counsel Act*, 10 Op. O.L.C. 68, 83 (1986) ("Cooper Opinion"); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 (1984) ("Olson Opinion"). A legislative body, then, generally has standing to sue to obtain information it claims it has been wrongfully denied, at least when a private party is withholding information. McGahn maintains the result is different when the defendant withholding the information is another branch of government, but the reasons he offers do not explain why the identity of the defendant should make a difference for purposes of standing, which is focused on whether the plaintiff is the proper party to bring the lawsuit. *See* Part III *infra*.

In sum, by virtue of the House's long-recognized subpoena power, the Committee was entitled to McGahn's testimony pursuant to its duly issued subpoena, which he has never challenged, and the specific information the Committee would learn therefrom in connection with carrying out its constitutional duties. By defying the subpoena, McGahn has deprived the Committee of that testimony and that deprivation is a concrete injury.

**B.**

The Committee's asserted injury must be not only concrete but also particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). An injury is not particularized if it is "undifferentiated" and "'common to all members of the public.'" *United States v. Richardson*, 418 U.S. 166, 177 (1974) (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). The injury, in short, must be specific to the plaintiff.

16

*Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), provides some guidance on particularization when a legislative institution seeks to show injury in fact. In that case, the Virginia House of Delegates sought to appeal the judicial invalidation of a redistricting plan in whose enactment it had participated. *Id.* at 1950. But the Virginia legislature was composed of two houses: the Senate and the House of Delegates. *See id.* at 1949. And the interest that the House of Delegates asserted — in defending the validity of a redistricting plan that it had approved — was shared with the Senate. *See id.* at 1953. Thus, to the extent that judicial invalidation of legislation constituted an injury in fact, the House of Delegates as one half of a bicameral legislature was not an appropriate party to vindicate that injury. Rather, to challenge the judicial invalidation, the Senate and House of Delegates would have needed to act together, akin to the circumstances of *Arizona State Legislature*, "in which the Court recognized the standing of the Arizona House and Senate — *acting together* — to challenge a referendum." *Id.* at 1953. What undermined the House of Delegates' attempt to show standing was the "mismatch between the body seeking to litigate and the body to which the relevant [state] constitutional provision allegedly assigned . . . authority." *Id.* Although not explicitly couched in terms of particularization, the Court's focus on "mismatch" is an inquiry into whether the claimed injury is personal to the plaintiff or else shared by a larger group of which the plaintiff is only a component — in other words, whether the injury is particularized.

The Committee's asserted injury is particularized because the Committee "is an institutional plaintiff asserting an institutional injury," *Ariz. State Legislature*, 135 S. Ct. at 2664. There is no "mismatch" here, *Va. House of Delegates*, 139 S. Ct. at 1953: the body whose informational and investigative prerogatives have been infringed is the body authorized by

House Resolution 430 to bring the present lawsuit. The power to issue a subpoena "may be exercised by a committee acting . . . on behalf of one of the Houses" of Congress. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975). The full House of Representatives has delegated its subpoena authority to its Committees, empowering each Committee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary." HOUSE RULE XI, cl. 2(m)(1). A House Committee that issues a subpoena, including the Committee on the Judiciary, thus exercises the subpoena power of the full House.

The House Judiciary Committee has issued the McGahn subpoena on behalf of, and with the authorization of, the full House of Representatives. There is no dispute that the House as an institution may unilaterally obtain what its authorized Committee seeks to compel here: McGahn's testimony. The Senate naturally need not sign off on the House's subpoenas; so it need not join efforts to vindicate them in the courts. Because the Committee exercised the investigative authority of the full House, the Committee was entitled to McGahn's testimony. Denial of his testimony is a deprivation that is a concrete injury and because the plaintiff is the distinctly injured party, the injury is particularized.

The House of Representatives has a unique interest under the Constitution in vindicating this injury. The Constitution places in the House sole responsibility to determine whether to file articles of impeachment against the President. U.S. CONST. art. 1, § 2, cl. 5. The subpoena power of the House exercised by the Committee in subpoenaing McGahn relates directly to that responsibility. The House's other constitutional functions of legislation and oversight are also handicapped by McGahn's

defiance of the subpoena, as explained in the Nadler Memorandum. Because of delegations pursuant to House Rules and passage of a House Resolution authorizing the present lawsuit, the Committee is an appropriate plaintiff to vindicate that injury.

## C.

The remaining two prongs of the traditional standing test — that the injury is "fairly traceable to the challenged conduct" and "is likely to be redressed by a favorable [judicial] decision," *Va. House of Delegates*, 139 S. Ct. at 1950 — are readily met. The injury that the Committee asserts has been directly caused by McGahn's conduct that it seeks to have enjoined. McGahn's refusal to testify before the Committee in response to a valid subpoena is responsible for the denial of information to which the Committee claims it is entitled and the resulting handicapping of the House's discharge of its constitutional obligations that the Committee now seeks to remedy in this lawsuit.

The injury is also likely to be redressed by a favorable judicial decision. The Committee's lawsuit seeks "declaratory and injunctive relief" "[d]eclar[ing] that McGahn's refusal to appear before the Committee in response to the subpoena issued to him was without legal justification" and "ordering McGahn to appear and testify forthwith before the Committee." Compl. at 53. If the court grants the Committee that relief, the deprivation that the Committee has suffered will be remedied. The Committee has therefore demonstrated redressability.

**III.**

The present lawsuit, brought by a Committee of the House of Representatives against a former White House Counsel, implicates considerations not always present in a standing dispute. McGahn contends that under *Raines v. Byrd*, 521 U.S. 811, separation of powers analysis prevents judicial airing and resolution of interbranch informational disputes like this one. Additionally, he views *Raines* itself, in particular its emphasis on history, to bar the present lawsuit. Each line of argument asserts a structural barrier to judicial involvement in informational disputes between the elected branches. With notable exceptions dating back at least to the 1970s, Congress and the Executive have "managed for over two centuries to resolve [informational] disputes among themselves." *Mazars*, 140 S. Ct. at 2031. That "longstanding practice . . . imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" *Id.* (second and third alterations in original) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014)). Our analysis demonstrates that holding the Committee has Article III standing involves no such disturbance.

**A.**

"[T]he law of Art[icle] III standing is built on a single basic idea — the idea of separation of powers." *Raines*, 521 U.S. at 820 (quoting *Allen*, 468 U.S. at 752). In turn, "federal courts may exercise power . . . only when adjudication is 'consistent with a system of separated powers,'" *Allen*, 468 U.S. at 752 (quoting *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)). The court's standing analysis has accounted for and ensured the federal judiciary's limited constitutional role, and the court does not act outside its

"properly limited . . . role," *Warth*, 422 U.S. at 498, in holding that the Committee has standing.  But McGahn maintains that in exercising jurisdiction over the present lawsuit and resolving whether he is required to testify, the court takes sides in an interbranch dispute, aggrandizes Congress at the expense of the Executive, or otherwise disrupts the balance of powers between the Branches. To the contrary, the judiciary, in exercising jurisdiction over the present lawsuit, does not arrogate any new power to itself at the expense of either of the other branches but rather plays its appropriate constitutional role.

**1.**

At the outset, there is reason for some skepticism regarding the foundation of McGahn's contention that *all* of the separation of powers objections he raises bear on whether the Committee has Article III standing.  After all, as the Supreme Court has long emphasized, "the requirement of standing 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)).  The statement in *Raines*, 521 U.S. at 820, that separation of powers was the "single basic idea" on which standing is based, appropriately reflects the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere."  It does not mean, as McGahn maintains, that merely invoking separation of powers principles defeats standing in interbranch disputes like this one. Not every separation of powers concern — including some that McGahn raises here — implicates the separation of powers principle underlying the standing doctrine, namely confining the judiciary to its proper role.  And in any event, the separation of powers objections McGahn raises do not withstand analysis

and are therefore unpersuasive.  Moreover, other separation of powers doctrines not before the *en banc* court, including the non-justiciability of political questions, separately address whether the court should decline to reach the merits of interbranch disputes.  *See Baker v. Carr*, 369 U.S. 186 (1962).

McGahn points to *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), where this court stated that it understood itself to be "require[d] . . . to merge our separation of powers and standing analyses."  *Id.* at 116.  On its face, that statement appears to support the position that all of the separation of powers objections that McGahn raises bear on the issue of the Committee's standing.  Yet in *Chenoweth*, the court was considering only whether individual Members of the House of Representatives had standing to sue the President to enjoin the implementation of a Presidential initiative.  The court stated that in the past it had dismissed such individual legislator lawsuits not on standing grounds but rather on the basis of "'circumscribed equitable discretion,'" under which "the court would decline to hear the complaint of a Congressman who 'could obtain substantial relief from his fellow legislators.'" *Id.* at 114 (quoting *Riegle v. Federal Open Market Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981)).  The separation of powers consideration that the court viewed as being a necessary part of its standing analysis was the need for the judiciary to "avoid 'meddl[ing] in the internal affairs of the legislative branch,'" *id.* at 116 (alteration in original) (quoting *Moore v. U.S. House of Representatives*, 733 F.2d 946, 956 (D.C. Cir. 1984)), by entertaining a lawsuit by an individual legislator whose "rights [could] be vindicated by congressional repeal of the [offending] statute,'" *id.* at 115 (alterations in original) (quoting *Moore*, 733 F.2d at 956).  It is this limited separation of powers concern, in the context of individual legislator suits and not implicated here, that *Chenoweth* stated must be part of the standing analysis.

So too in *Arizona State Legislature*, the Supreme Court stated that "a suit between Congress and the President would raise separation-of-powers concerns absent" in that case, which involved a state legislative body. *Ariz. State Legislature*, 135 S. Ct. at 2665 n.12. The Court did not hold that such concerns should be considered separately to preclude a legislative body's lawsuit against the Executive Branch but rather emphasized its directive from *Raines* for a standing analysis that is "'especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Id.* (quoting *Raines*, 521 U.S. at 819–20). Because the Committee has identified a concrete injury, namely a former Executive Branch official's defiance of a valid subpoena, and is the institution duly authorized to maintain the present lawsuit, the obstacles to suits by individual legislators are inapplicable.

This court, however, need not resolve whether *Raines*, *Chenoweth*, or *Arizona State Legislature* stands for the proposition that any objection that falls within the broad ambit of "separation of powers" may defeat a plaintiff's standing because none of McGahn's separation of powers objections to the Committee's standing is persuasive.

The Supreme Court's recent decision in *Trump v. Mazars USA, LLP* elaborates on the separation of powers concerns where Congress and the President are at odds over information. The Court stated because "Congress and the President have an ongoing institutional relationship as the 'opposite' and 'rival' political branches established by the Constitution, . . . congressional subpoenas directed at the President differ markedly" from those issued to private parties. *Mazars*, 140 S. Ct. at 2033–34 (quoting FEDERALIST NO. 51 (J. Madison)).

That is, "congressional subpoenas for the President's information unavoidably pit the political branches against one another" and represent "a clash between rival branches of government over [testimony] of intense political interest for all involved." *Id.* at 2034. *Mazars* addressed the merits of a challenge to the validity of a congressional subpoena, not the plaintiff's standing, but the concerns about the adjudication of such interbranch disputes expressed in *Mazars* may be implicated here. Such concerns do not bar the Committee's standing, however. Much of the Supreme Court's attention was directed to the implications of a "limitless" congressional subpoena power that "would transform the 'established practice' of the political branches." *Id.* at 16 (quoting *Noel Canning*, 573 U.S. at 524). This court explains in responding to McGahn's separation of powers objections, *see* Part III.A.2 *infra*, why allowing the Committee to proceed with the present lawsuit would preserve, rather than disrupt, that historical practice of accommodation. Furthermore, McGahn has never challenged the validity of the Committee's subpoena.

**2.**

McGahn begins his separation of powers objections by maintaining that if the Committee has standing, then Congress will have been provided "a blueprint for extensive expansion of the legislative power' by allowing Congress to 'arrogate power to itself,'" empowering Congress to unilaterally resolve informational disputes without engaging in the historical practice of negotiating informational disputes with the Executive Branch. Appellant Br. at 24–25 (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010)). Courts must take care not to disrupt the "longstanding practice" of accommodation between the political branches. *Mazars*, 140 S. Ct. at 2031. But there is no congressional "arrogation" of power here and no threat that the

court's decision will disrupt the historical practice of accommodation. To the contrary, permitting Congress to bring this lawsuit preserves the power of subpoena that the House of Representatives is already understood to possess. Rather, it is McGahn's challenge to the Committee's standing that seeks to alter the *status quo ante* and aggrandize the power of the Executive Branch at the expense of Congress.

For more than forty years this circuit has held that a House of Congress has standing to pursue a subpoena enforcement lawsuit in federal court. *See Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 20–22 (D.D.C. 2013); *Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 68–78 (D.D.C. 2008); *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976); *Senate Select Comm.*, 498 F.2d at 728; *see also* Part III.B.2 *infra*. McGahn does not suggest that any court, prior to the vacated panel majority in the present case, has ever ruled to the contrary. Congress and the Executive Branch have long operated under the assumption that Congress may, if necessary, seek enforcement of a subpoena in federal court.

Accepting McGahn's position that the Committee lacks standing would significantly curtail the possibility of accommodation. That outcome would upset settled expectations and dramatically alter bargaining positions in the accommodation process over informational disputes in the future. Without the possibility of enforcement of a subpoena issued by a House of Congress, the Executive Branch faces little incentive to reach a negotiated agreement in an informational dispute. Indeed, the threat of a subpoena enforcement lawsuit may be an essential tool in keeping the Executive Branch at the negotiating table. For example, President Clinton and a Senate subcommittee "[e]ventually . . . reached an agreement" over an informational dispute only after

"a Senate threat to seek judicial enforcement of the subpoena." *Mazars*, 140 S. Ct. at 2030. Without that possibility, Presidents could direct widescale non-compliance with lawful inquiries by a House of Congress, secure in the knowledge that little can be done to enforce its subpoena — as President Trump did here. *See* Letter from Pat A. Cipollone, White House Counsel, to Hon. Nancy Pelosi, Speaker of the House, et al., at 7 (Oct. 8, 2019). Traditional congressional oversight of the Executive Branch would be replaced by a system of voluntary Presidential disclosures, potentially limiting Congress to learning only what the President wants it to learn. And the power of impeachment, the "essential check . . . upon the encroachments of the executive," FEDERALIST NO. 66 (A. Hamilton), would be diminished because a President would be unlikely to voluntarily turn over information that could lead to impeachment.

Neither does holding that the Committee has Article III standing displace the historical practice of accommodation, as McGahn maintains. Litigation, as the General Counsel to the Committee emphasized to this court during oral argument, is not a preferred option of politicians. *See* En Banc Oral Arg. Tr. at 121–22. The subpoena to McGahn was issued over 15 months ago and litigation over its enforcement continues. A Congress lasts for only two years, *see* U.S. CONST. art. I, § 2, cl. 1; *id.* amend. XX, § 1, and the current Congress may expire before the House of Representative can complete the present litigation and obtain judicial enforcement of its subpoena. Despite the Committee's subpoena of McGahn in regard to its investigation pursuant to the House's "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5, and its continuing efforts to reach accommodations for McGahn to testify, the President refused to permit McGahn to testify, *see* Cipollone Letter of May 20, 2019, to Chairman Nadler, at 1–2, and subsequently refused to allow any member of the Executive

Branch to cooperate with the Committee's investigation, *see* Cipollone Letter of Oct. 8, 2019, to Speaker Pelosi, at 7. In such circumstances, where there is an impasse contrary to traditional norms, no practicable alternative to litigation exists. That result stems not from the court's holding that the Committee has standing to seek judicial enforcement of its subpoena, but from a rare breakdown in the accommodation process itself. The parties' historical responsibility to engage in negotiations to resolve their interbranch informational disputes, *see United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977), remains unaffected by holding that the Committee has Article III standing.

McGahn next maintains that resolving this interbranch dispute would constitute a judicial arrogation of power at the expense of Congress and the Executive, which ought to resolve it themselves. "In order to remain faithful to [the federal government's] tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches." *Spokeo*, 136 S. Ct. at 1547. But by permitting the Committee to bring a lawsuit in federal court to enforce its subpoena, the court is not enlarging the power or prerogatives of the federal judiciary. To the contrary, subpoena enforcement is a "familiar judicial exercise," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012), a not unusual corollary to civil litigation. The Federal Rules of Civil Procedure authorize a party to issue, under the auspices of the court, a subpoena ordering testimony, document production, or production of other tangible objects. *See* FED. R. CIV. P. 45(a). Upon objection by the recipient of such a civil subpoena that compliance would require the disclosure of privileged matter, a motion requesting that the court quash the subpoena would be available. *See* FED. R. CIV. P. 45(e)(2). The court must quash or modify the subpoena if it determines that the subpoena "requires disclosure of privileged or other protected matter."

FED. R. CIV. P. 45(d)(3). When the party has no valid grounds for objecting, the court may enforce the subpoena by holding in contempt a person who refuses to obey it. *See* FED. R. CIV. P. 45(g). Thus, the precise function that the Committee asks the court to perform, namely determining whether McGahn has a valid excuse for refusing to appear and testify before the Committee and compelling his compliance with its subpoena if he does not, is a traditional feature of civil litigation in federal court.

Further, contrary to McGahn's assertion, the court does not impermissibly take sides in an interbranch dispute by holding that the Committee has standing and resolving whether or not McGahn is required to appear and testify. What the Committee seeks through its subpoena enforcement lawsuit is resolution of a discrete and limited legal issue: whether McGahn must appear before it to testify, absent invocation of a valid privilege that would excuse his refusal to answer specific questions. Given McGahn's previous role as a close presidential advisor, it is plausible that Executive privilege could be properly asserted in response to at least some of the Committee's questions, depending on their substance. *See generally United States v. Nixon*, 418 U.S. 683, 705 (1974). Such a potentially available privilege is a powerful protection of the President's interest in Executive Branch confidentiality, and it remains unaffected by an order compelling McGahn to appear and testify before the Committee. Consequently, entertaining the Committee's subpoena enforcement lawsuit does not raise the specter that the judiciary is taking sides in an interbranch dispute. A court is not normally understood to be taking sides when it enforces a subpoena in civil litigation, and McGahn points to nothing to support a contrary conclusion here.

McGahn also maintains that exercising jurisdiction would impede the Executive in the performance of its constitutional responsibilities because only the Executive Branch is constitutionally empowered to "conduct[] civil litigation in the courts of the United States for vindicating public rights," *Buckley v. Valeo*, 424 U.S. 1, 140 (1976). The traditional means of enforcing congressional subpoenas, according to McGahn, has been through the criminal contempt statute, 2 U.S.C. § 192, which can result in imprisonment of up to one year and a fine of up to $1,000. When a House of Congress holds a person in contempt, the recalcitrant subpoena recipient may be referred to the Department of Justice for criminal prosecution. McGahn asserts that by attempting to enforce its subpoena directly in federal court and circumventing the Executive's prosecutorial role, the House infringes on the Executive's exclusive authority to enforce the law. Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor. *See, e.g.*, *Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019); *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68–69 (2008) Cooper Opinion, 10 Op. O.L.C. at 83; Olson Opinion, 8 Op. O.L.C. at 142; *see also* Part III.B.2 *infra*. So understood, the Department almost certainly would not pursue prosecution of McGahn. Moreover, although the Supreme Court in *Buckley* pointed to the constitutional principle that law enforcement is the exclusive province of the Executive Branch, the Court distinguished between the Executive Branch's law enforcement authority and Congress's "powers . . . essentially of an investigative and informative nature." *Buckley*, 424 U.S. at 137. The argument that the present lawsuit would circumvent the President's performance of his constitutional law enforcement responsibilities is misplaced.

McGahn maintains as well that assuming jurisdiction here threatens to undermine the judiciary itself. Judicial "intervention" in an "interbranch dispute," he argues, could "risk damaging the public confidence that is vital to the functioning of the Judicial Branch." Appellant Supp. Br. at 2 (quoting *Raines*, 521 U.S. at 833 (Souter, J., joined by Ginsburg, J., concurring in the judgment)). That risk is minimal here not only because the Committee is a proper plaintiff, but also because the issue that the Committee asks the court to decide can be answered by applying established legal doctrines without the court weighing in on the political dispute between the House and the President. Adjudication of whether McGahn must appear and testify in compliance with the Committee's concededly valid subpoena does not "raise[] [the] specter of judicial readiness to enlist on one side of a political tug-of-war," *Raines*, 521 U.S. at 834 (Souter, J., concurring in the judgment). Although the present lawsuit unfolded in the context of a highly charged political battle over whether to impeach the President, the court "has a responsibility to decide cases properly before it, even those it 'would gladly avoid,'" and "courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 566 U.S. at 194, 196 (first quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404 (1821), then quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)). Once the Committee has met its burden to show that it has Article III standing to seek judicial enforcement of its subpoena, the court may not avoid its responsibility to decide the case because of its political context or consequences.

McGahn maintains too that courts lack the authority to "adjudicate disputes exclusively between the political branches even where no individual party's rights are at stake." Appellant Supp. Br. at 16. That objection is foreclosed by *Raines* and *Arizona State Legislature*. In *Raines*, the Court stated that "the

institutional injury [plaintiffs] allege is wholly abstract and widely dispersed." *Raines*, 521 U.S. at 829. By identifying those two defects with the alleged institutional injury, the Court left open the possibility that some institutional injuries would be sufficient to confer a legislative body standing. In other words, if no institutional injury to a legislative body would be adequate to confer standing, then the Court in *Raines* would not have bothered to identify shortcomings with the specific institutional injury alleged, namely, that it was "wholly abstract and widely dispersed." The Court need only have stated that the alleged injury was an institutional one incurred by a legislative body and left it at that. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, the Supreme Court held that the Arizona State Legislature had incurred an institutional injury where it sought to challenge as unconstitutional a ballot provision vesting redistricting authority in an independent agency. Again, the Court's holding precludes the view that there is standing only when an individual right is implicated. *See also Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187 (1972).

**B.**

McGahn additionally advances an interpretation of the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811, to require the conclusion that the Committee lacks Article III standing. He ignores *Raines*'s limits. The Supreme Court has given clear direction that *Raines* is a narrow case about the standing only of individual legislators. Nevertheless, McGahn relies on *Raines* to argue that the present dispute is not one "traditionally thought to be capable of resolution through the judicial process," *Raines*, 521 U.S. at 819. The history of judicial adjudication of such disputes undermines McGahn's conclusion.

31

**1.**

In *Raines*, six Members of Congress sued the Director of the U.S. Office of Management and Budget to challenge the constitutionality of the Line Item Veto Act, which authorized the President to cancel spending provisions in enacted appropriations statutes. *Id.* at 814–15. The Supreme Court held that the individual members of Congress lacked standing. *Id.* at 829. The Court has since clarified that *Raines* is a decision narrowly concerned with the standing of individual Members of Congress. In *Arizona State Legislature*, the Court explained that "[i]n *Raines*, [the] Court held that six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act," "holding specifically and only that 'individual members of Congress [lack] Article III standing.'" *Ariz. State Legislature*, 135 S. Ct. at 2664 (third alteration in original) (quoting *Raines*, 521 U.S. at 813–14). And in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, the Supreme Court referenced *Raines* in deciding that a single house of a bicameral state legislature did not have standing to appeal judicial invalidation of a state redistricting plan, relying on *Raines* only for the narrow proposition that "individual members lack standing to assert the institutional interests of a legislature." *Id.* at 1953.

The Supreme Court has not stated that *Raines* would bar a lawsuit brought by an authorized legislative institution asserting an institutional injury. *See Raines*, 521 U.S. at 829–30. Guided by *Arizona State Legislature* and by *Raines* itself, this court has understood *Raines* to concern the standing of individual members of a legislative body and relied on it to hold that unauthorized legislators lack standing to sue the President to vindicate injuries to the legislative bodies of which they are a part. *See Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020); *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000);

*Chenoweth*, 181 F.3d 112. All of those cases involved individual unauthorized legislators' attempts to sue the President. In *Blumenthal*, the court stated that "*Raines* is our starting point when individual members of Congress seek judicial remedies." *Blumenthal*, 949 F.3d at 19. The court cited approvingly "[t]he Supreme Court's recent summary reading of *Raines* that 'individual members' of the Congress 'lack standing to assert the institutional interests of a legislature' in the same way 'a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole.'" *Id.* (quoting *Va. House of Delegates*, 139 S. Ct. at 1953–54). And in *Campbell* the court treated *Raines* as a case about individual legislator standing, stating that "[t]he question whether congressmen have standing in federal court to challenge the lawfulness of actions of the executive was answered, at least in large part, in the Supreme Court's recent decision in *Raines v. Byrd*." *Campbell*, 203 F.3d at 20.

*Arizona State Legislature* and *Virginia House of Delegates* as well as this court's precedent confirm that *Raines* stands for the proposition that whereas a legislative institution may properly assert an institutional injury, an individual member of that institution generally may not. McGahn would have this court disregard the clear limit that the Supreme Court itself has placed on *Raines*'s reach, something this lower court may not do.

**2.**

Finally, McGahn contends that the reasoning of *Raines* defeats the standing of an entire House of Congress. Taken on its own terms, *Raines* does not require the court to hold that the Committee lacks Article III standing. In *Raines*, the Supreme Court identified four considerations on which it relied in

holding the individual Members of Congress lacked standing: (1) the individual plaintiffs alleged an institutional injury that was "wholly abstract and widely dispersed"; (2) plaintiffs' "attempt to litigate th[eir] dispute at this time [wa]s contrary to historical experience"; (3) the plaintiffs "ha[d] not been authorized to represent their respective Houses of Congress . . . , and indeed both Houses actively oppose[d] their suit"; and (4) dismissing the lawsuit "neither deprive[d] Members of Congress of an adequate remedy . . . , nor foreclose[d] the Act from constitutional challenge." *Raines*, 521 U.S. at 829. The Court added, moreover, that "[w]hether the case would be different if any of these circumstances were different we need not now decide." *Id.* at 829–30. None of the four considerations is present here.

In Part II *supra*, the court explained that the Committee's injury is concrete and particularized and thus neither abstract nor widely dispersed. The Committee, unlike the unauthorized individual legislators in *Raines*, was authorized by House Resolution 430 to bring the present lawsuit to enforce its subpoena. And the OLC has twice opined that a civil enforcement suit is the only practicable way that a House of Congress may enforce a subpoena against a current or former Executive Branch official asserting Executive privilege, because neither subpoena enforcement alternative — prosecution by the Department for violation of the criminal contempt statute or detention by the House pursuant to its inherent contempt authority — is practicable. *See* Cooper Opinion, 10 Op. O.L.C. at 83; Olson Opinion, 8 Op. O.L.C. at 140, 142. The criminal contempt statute is not available to vindicate the House's injury because the "contempt of Congress statute does not require and could not constitutionally require a prosecution" of an Executive Branch official who defies a congressional subpoena on the basis of Executive privilege "or even . . . a referral to a grand jury of the facts

relating to the alleged contempt." Olson Opinion, 8 Op. O.L.C. at 142. The alternative, detaining McGahn pursuant to the House's inherent contempt authority, is similarly impracticable. Because Congress has not exercised its inherent contempt authority against an Executive Branch official since 1917, "it seems most unlikely that Congress would dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege." Cooper Opinion, 10 Op. O.L.C. at 86. The prospect that the House will direct its Sergeant at Arms to arrest McGahn is vanishingly slim so long as a more peaceable judicial alternative remains available.

McGahn emphasizes the historical analysis in *Raines* and concludes that because federal courts have not historically entertained congressional subpoena enforcement lawsuits, the Committee lacks standing. There are serious flaws to his argument, not the least of which is that the Court's discussion of history in *Raines* informed its conclusion that individual legislator plaintiffs lacked standing, but did not append to the three-pronged standing analysis an entirely distinct historical prong.

Nor does the relevant historical practice support McGahn's position. For more than forty years this circuit has acknowledged that defiance of a subpoena issued by a House of Congress constitutes an institutional injury in fact that is judiciary remediable. In *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, the *en banc* court declined to enforce a Senate Committee subpoena *duces tecum* served on the President for production of the "Nixon tapes." In reaching the merits the court observed without disagreement that the district court had rejected the President's contention that the lawsuit was a non-justiciable interbranch conflict. *See id.* at 728. "Finding the reasoning of this court in *Nixon v. Sirica*, which concerned a grand jury

subpoena, 'equally applicable to the subpoena of a congressional committee,' the [d]istrict [c]ourt held that, under that case and the relevant Supreme Court precedent, the issues presented to it were justiciable." *Id.* (quoting *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 370 F. Supp. 521, 522 (D.D.C. 1974)). This court, satisfied with that analysis, proceeded to address the merits. *See id.* at 728–29.

This court revisited a similar issue two years later in *United States v. AT&T*, 551 F.2d 384. The United States sued to enjoin AT&T from complying with a congressional Committee subpoena on national security grounds. The President had directed AT&T, "as an agent of the United States, to respectfully decline to comply with the Committee subpoena," *id.* at 387, and the House of Representatives had intervened as a defendant to represent its interest in AT&T's compliance with the subpoena. The court characterized the case as a "portentous clash between the executive and legislative branches," *id.* at 385, and undertook a more extensive jurisdictional analysis than it had in *Senate Select Committee*. It concluded that "*Senate Select Committee* establishes, at a minimum, that the mere fact that there is a conflict between the legislative and executive Branches over a congressional subpoena does not preclude judicial resolution of the conflict." *Id.* at 390. The court held that "[i]t is clear that the House as a whole has standing to assert its investigatory power." *Id.* at 391.

Contrary to McGahn's position that the relative recency of this historical practice renders it irrelevant, historical practice is constitutionally significant even when it does not extend as far back into the past as the Founding. Interpreting the Recess Appointment Clause of the Constitution, the Supreme Court stated in *NLRB v. Noel Canning*, 573 U.S. 513, that "in interpreting the Clause, we put significant weight upon

historical practice," and that "precedent[] show[s] that this Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 524–26; *see id.* at 525–26 (collecting cases). McGahn's narrow view of relevant history is at odds with this recent pronouncement of the Supreme Court in the context of the constitutional separation of powers.

In fact, the relevant history includes a long tradition of Presidential cooperation with the Legislative Branch exercising its constitutional responsibilities. Although there have been relatively few instances of interbranch subpoena enforcement litigation, the history of Presidential cooperation has meant that there have been few occasions necessitating resort to the courts. The Committee explains: "[E]arly Presidents overwhelmingly complied with Congressional inquiries, reflecting their understanding that they had a constitutional obligation to cooperate." Appellee Supp. Br. at 14; *see Mazars*, 140 S. Ct. at 2031. The Presidents and the Houses of Congress traditionally have been able to resolve disputes over requests for Executive Branch documents and testimony. Even in pitched disputes between the branches, each branch traditionally has displayed respect for the constitutional prerogatives of the other branch and responded accordingly. *See* Appellee Supp. Br. at 14–18. The apparently unprecedented categorical direction by President Trump that no member of the Executive Branch shall cooperate with the Committee's impeachment investigation, *see* Cipollone Letter of Oct. 8, 2019, to Speaker Pelosi, at 7, likely explains the infrequency of subpoena enforcement lawsuits such as the present one. *See* Appellee Supp. Br. at 17–18; *see id.* at 26.

In conclusion, the present lawsuit does not "run[] afoul" of the "structural principle" underlying the standing inquiry,

*Allen*, 468 U.S. at 761, including the proper role of the judiciary and preservation of the *status quo ante* between the branches for over 200 years. Holding that the Committee has standing would safeguard the separation of powers. It would ensure the continuation of the "established practice" of accommodation by preserving the legal background against which the political branches have historically negotiated their informational disputes. It would ensure that in the rare case — here in the course of no less than an impeachment investigation — when the political branches have reached an impasse despite repeated attempts to resolve an informational dispute themselves, a congressional Committee can seek judicial enforcement of its duly issued subpoena. Preserving the power of a House of Congress to ensure compliance with its subpoena, in turn, enables it to carry out its constitutional responsibilities, which include serving as an essential check on the President and the Executive Branch, Federalist No. 66 (A. Hamilton); *see* Federalist No. 69 (A. Hamilton). The Supreme Court has placed clear limits on the scope of *Raines*'s holding, and taken on its own terms *Raines* is consistent with the Committee's standing. In particular, the history of judicial adjudication of interbranch informational disputes not unlike the present one undermines McGahn's position that courts have not heretofore resolved such disputes.

Our dissenting colleagues reprise the views expressed in their panel opinions that have been vacated by the order granting the Committee's petition for rehearing *en banc*. They take a different path than the *en banc* court in resolving the standing issue in the present litigation, largely adopting the positions that McGahn advocates. As explained at length, those contentions are unpersuasive. Given the rigor with which the *en banc* court has addressed the Article III standing issue and analyzed McGahn's positions, there is no need to respond further to each our of dissenting colleagues' opinions, other

than to underscore that the separation of powers and history are an integral part of, not divorced from, the *en banc* court's standing inquiry. And because the only issue before the *en banc* court is the Committee's Article III standing, this is not the occasion to respond to their views on other challenges raised by McGahn.

* * * *

Accordingly, we hold that the Committee has Article III standing to seek enforcement in federal court of its duly issued subpoena in the performance of constitutional responsibilities. Therefore, we affirm the judgment of the district court in part. Consideration of McGahn's other contentions — including threshold pre-merits objections that there is no subject matter jurisdiction and no applicable cause of action, and potential consideration of the merits if reached — remain to be decided and are remanded to the panel to address in the first instance.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: The Court holds today that the Committee on the Judiciary of the United States House of Representatives (Committee) has Article III standing to bring suit in federal court to enforce subpoenas against the Executive Branch. I dissent for the reasons stated in my concurrence in *Committee on the Judiciary of the United States House of Representatives v. McGahn*, 951 F.3d 510, 531–42 (D.C. Cir. 2020), *vacated, reh'g en banc granted sub nom. U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1228477 (D.C. Cir. Mar. 13, 2020), and I incorporate by reference thereto that previously published opinion as my dissent here. I write separately, however, to address recent Supreme Court case law whose effect the majority has minimized.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), which, "[i]n the constitutional sense, . . . means the kind of controversy courts traditionally resolve," *United States v. Nixon*, 418 U.S. 683, 696 (1974). Derived "[f]rom Article III's limitation of the judicial power . . . and the separation-of-powers principles underlying that limitation," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014), our standing inquiry therefore "serves to identify those disputes which are appropriately resolved through the judicial process," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). This suit is not one of them.

For over two hundred years, the coordinate branches did not enlist the Judiciary in their fights. But our court did not leave well enough alone and, roughly forty years ago, set about to "umpire disputes between th[e] branches regarding their respective powers." *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in the judgment). This approach started to collapse under its own weight, however, as "the Supreme Court began to place greater emphasis upon the separation of powers concerns underlying

the Article III standing requirement," *Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999), and after *Raines v. Byrd*, 521 U.S. 811 (1997), our "broad theory of legislative standing" became untenable, *see Chenoweth*, 181 F.3d at 117 n.*. Notwithstanding our court's past ill-advised effort to mediate battles between the political branches, the fact remains that the High Court has yet to sanction such an intrusion and we, an inferior court, should not take it upon ourselves to alter the balance of powers. The majority "opinion is like a pirate ship. It sails under a [separation-of-powers] flag," *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1755 (2020) (Alito, J., joined by Thomas, J., dissenting); *see, e.g.*, Majority Op. at 36–37, but in fact undermines the calibrated system of interbranch conflict resolution the Constitution requires.

Granted, "merely invoking separation of powers principles," Majority Op. at 20, does not automatically preclude us from exercising the judicial power. Indeed, this case implicates the separation of powers in multiple ways, not all of which affect the Committee's standing. The "separation of powers concerns" that arise in an "interbranch conflict" over "[c]ongressional demands for the President's information," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035 (2020), do not necessarily place a suit beyond our ken, *see NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[I]t is the 'duty of the judicial department'—in a separation-of-powers case as in any other—'to say what the law is.'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). But there is also the "time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," *Raines*, 521 U.S. at 820, and this separation-of-powers element, indivisible from Article III standing, "confines the federal courts to a properly judicial role," *Spokeo*, 136 S. Ct. at 1547.

Although the majority appears to recognize as much, *see, e.g.*, Majority Op. at 19–20, it gives short shrift to the fact that an injury must therefore be "personal, particularized, concrete, and *otherwise judicially cognizable*," *Raines*, 521 U.S. at 820 (emphasis added), "to ensure that federal courts do not exceed their authority as it has been traditionally understood," *Spokeo*, 136 S. Ct. at 1547. Legislative bodies are not exempt from the requirement that "an injury must be 'legally and judicially cognizable,'" *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) (quoting *Raines*, 521 U.S. at 819), and Article III standing may be wanting if, after "consult[ing] history and judicial tradition," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2695 (2015) (Scalia, J., joined by Thomas, J., dissenting), the dispute is not "of the sort traditionally amenable to, and resolved by, the judicial process," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Simply put, we must consider whether the Committee's "attempt to invoke the power of a federal court . . . is consistent with the structure created by the Federal Constitution" and "[a]n interest . . . that is inconsistent with that structure may not be judicially cognizable." *Bethune-Hill*, 139 S. Ct. at 1959 (Alito, J., joined by Roberts, C.J., Breyer, J., and Kavanaugh, J., dissenting).

I continue to believe the longstanding practice of resolving political disputes without judicial intervention counsels against the Committee's standing here. "[T]he Constitution established that '[j]udicial power could come into play only in matters that were the traditional concern of the courts at Westminster,'" *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (second alteration in original) (quoting *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (Frankfurter, J., dissenting)), and "[c]ertainly neither the houses of Parliament nor the British monarchs ever considered submitting their disputes to the courts," JOSH CHAFETZ, CONGRESS'S

CONSTITUTION 190 (2017). Likewise, "in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power," *Raines*, 521 U.S. at 826, despite the fact that these "decades-long disputes . . . would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has . . . ." *United States v. Windsor*, 570 U.S. 744, 790 (2013) (Scalia, J., joined by Roberts, C.J., and Thomas, J., dissenting).[1]

Just last month, the Supreme Court emphasized that interbranch disputes like this one "have not ended up in court. Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378 and S. 2420 Before the Subcomm. on Intergovernmental Rels. of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Att'y Gen., Office of Legal Counsel)). Under the guise of "preserv[ing] . . . that historical practice of accommodation," Majority Op. at 23, the majority posits that without the possibility "of a subpoena enforcement lawsuit"—i.e., a judicial remedy—"the Executive Branch faces little incentive to reach a negotiated agreement in an informational dispute" with the Congress, *id.* at 24. But

---

[1] The majority is quick to cabin *Raines* to its facts. But even accepting, *arguendo*, the majority's premise "that *Raines* is a narrow case about the standing only of individual legislators," Majority Op. at 30, it does not follow that *Raines*'s discussion of historical practice is therefore stripped of persuasive effect, *cf. Windsor*, 570 U.S. at 790 (Scalia, J., joined by Roberts, C.J., and Thomas, J., dissenting) ("*Raines* d[oes] not formally decide this issue, but its reasoning does.").

"[f]or more than two centuries, the political branches have resolved information disputes" themselves. *Mazars*, 140 S. Ct. at 2035.

In suggesting that the Judiciary is needed to "keep[] the Executive Branch at the negotiating table," Majority Op. at 24, the majority largely ignores "the wide variety of means that the Constitution puts at [the House's] disposal," *Mazars*, 140 S. Ct. at 2035, if a recalcitrant President orders "widescale non-compliance with lawful inquiries by a House of Congress," Majority Op. at 25. The House may, for example, withhold appropriations or, as it did here, impeach the President for "[d]irecting the . . . def[iance of] a lawful subpoena." H.R. Res. 755, 116th Cong., at 6 (2019).[2] Thus, even if the House is unlikely to invoke its inherent contempt authority or pursue a criminal prosecution, *see* Majority Op. at 33–34, it is untrue that "no practicable alternative to litigation exists," *id.* at 26. The political process may be messy, subject to the pitfalls of supercharged partisanship, but "we must put aside the natural urge . . . to 'settle' [this dispute] for the sake of convenience and efficiency," *Raines*, 521 U.S. at 820, no matter how tantalizing a "judicial alternative" appears, Majority Op. at 34.

---

[2] Although the Constitution expressly provides these mechanisms to resolve interbranch conflict, it is notably silent on the Judiciary's role in such disputes. Considering Article III carved out "as specific, independent categories of federal judicial power, 'controversies' between states, between a state and citizens of another state, and so on[,] . . . it is incredible that Framers who intended to extend judicial power to direct controversies between Congress and the President failed to include so important a category in their recitation." *Barnes v. Kline*, 759 F.2d 21, 57 (D.C. Cir. 1984) (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987).

By holding that the Committee has standing, the majority enlarges the Judiciary's power to intervene in battles that should be waged between the Legislature and the Executive and opens the door to future disputes between the political branches. *Cf. Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("[Standing] is founded in concern about the proper—and properly limited—role of the courts in a democratic society."). Even if "the precise function" we perform in this case— subpoena enforcement—"is a traditional feature of civil litigation in federal court," Majority Op. at 27, "congressional subpoenas directed at" the Executive Branch "differ markedly" because they "unavoidably pit the political branches against one another," *Mazars*, 140 S. Ct. at 2034. This distinction matters. If the interbranch character of the dispute was of no consequence, any President could presumably challenge in court laws that he believes infringe upon Article II powers. And statutory interpretation, like subpoena enforcement, is also a "familiar judicial exercise." Majority Op. at 26 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)). Although "[t]here would be nothing irrational about a system that granted standing in" such a case, "it is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828. "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts," *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009), which did not hear suits between coordinate branches of government. The majority's broad conception of legislative standing, however, disregards this limitation. Accordingly, I respectfully dissent.

GRIFFITH, *Circuit Judge*, dissenting: Today the court relegates the separation of powers from a core component of Article III to an afterthought. The court severs the standing analysis from its separation-of-powers roots and treats a direct dispute between the Legislative and Executive Branches as if it were any old case. The result is an anemic Article III jurisprudence that flouts a long line of Supreme Court precedent, ignores the basic structure of the Constitution, and resuscitates long-discredited case law from this circuit.

And for what? Who benefits from today's decision? Not Congress. The majority's ruling will supplant negotiation with litigation, making it harder for Congress to secure the information it needs. And the Committee likely won't even get what it wants in *this* case. Because the majority declines to decide whether the Committee has a cause of action and whether it should prevail on the merits, the chances that the Committee hears McGahn's testimony anytime soon are vanishingly slim. The federal courts won't benefit, either. The majority's decision will compel us to referee an interminable series of interbranch disputes, politicizing the Judiciary by repeatedly forcing us to take sides between the branches. Most importantly, the decision does grave harm to the Constitution's system of separated powers, which constrains federal courts to the narrow task of resolving concrete "Cases" and "Controversies" so that elected representatives call the political shots. I cannot join the court's expedition into an area where we do not belong and can do no good.

I

The most puzzling aspect of today's decision is the court's disregard for the relationship between Article III and the separation of powers. Heedless of the interbranch nature of this dispute, the majority trots through the three-part standing test from *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), as if the Committee were just like a private party enforcing a

subpoena in a breach-of-contract suit. The majority returns this circuit to the prudential approach to standing that we experimented with decades ago and that the Supreme Court rejected in *Raines v. Byrd*, 521 U.S. 811 (1997). And the court fails to offer any limits to its revived doctrine of congressional standing, leaving future panels to struggle to find a coherent stopping point.

A

The majority's disregard for the separation of powers is apparent on the face of the opinion. The court announces its "skepticism" that "the separation of powers . . . bear[s] on whether the Committee has Article III standing." Maj. Op. at 20. The Supreme Court might be surprised to hear that. Time and again, the Court has said that standing "is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at 820 (internal quotation marks omitted). For that reason, "questions . . . relevant to the standing inquiry *must* be answered by reference to the Art[icle] III notion that federal courts may exercise power . . . only when adjudication is consistent with a system of separated powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see also id.* at 761 n.26; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Flast v. Cohen*, 392 U.S. 83, 97 (1968).

The "concrete injury" requirement imbues standing doctrine with its "separation-of-powers significance." *Lujan*, 504 U.S. at 577. That requirement is also "grounded in historical practice," and we must ask whether an alleged harm "has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). The Judiciary does not and never has resolved direct disputes between the political branches. The

"traditional role" of the federal courts "is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). Interbranch disputes thus "lie[] far from the . . . conceptual core of the case-or-controversy requirement." *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015) (noting that lawsuits between the Legislative and Executive Branches raise "separation-of-powers concerns").

Those considerations about the traditional role of the Judiciary bear directly on whether the Committee's asserted injury—deprivation of testimony that hinders the Committee in "carrying out its constitutional functions," Maj. Op. at 14—suffices to establish standing. We thus cannot evaluate whether this suit presents an Article III case or controversy by abstracting away from the critical facts: the Committee on the Judiciary of the United States House of Representatives is suing the former White House Counsel to compel him to divulge information obtained during the course of his duties, and the Committee seeks that information to effectuate its institutional prerogatives to conduct oversight of the Executive Branch and to impeach the President. The question is whether *that* injury to the Committee is "legally and judicially cognizable," and whether *that* claim is "traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S. at 819 (internal quotation marks omitted).

Yet the majority breezes through the injury-in-fact analysis with scarcely a word about the interbranch nature of this dispute. *See* Maj. Op. at 7-18. Because "private parties undeniably have standing to seek judicial enforcement of compliance with subpoenas," the majority reasons, the Committee must also have standing to enforce the Executive

4

Branch's compliance with a congressional subpoena. *Id.* at 14. But that analogy breaks down twice over. First, the fact that we may resolve similar information disputes between private parties does not answer whether we can resolve an *interbranch* information dispute. Second, although enforcement of a subpoena issued under the auspices of our own Article III power is a "familiar judicial exercise," *id.* at 26 (quotation marks omitted), there is nothing "[]usual" or "traditional," *id.*, about the Committee's request that Article III judges enforce an Article I subpoena against an Article II officer.

The majority's entire affirmative case is thus premised on a faulty analogy between an injury to *private parties* and an injury to *Congress*. The majority justifies its neglect of the interbranch nature of this dispute by arguing that separation-of-powers concerns require its standing analysis to be "'especially rigorous,'" not that those "separation of powers concern[s] . . . must be part of [its] standing analysis." *Id.* at 21 (quoting *Raines*, 521 U.S. at 819-20). I confess I do not know what it means to conduct the "rigorous" standing analysis that the separation of powers requires without considering the separation of powers as part of that analysis. The majority makes no substantive mention of the separation of powers until eighteen pages into the opinion, and even then, it asks only whether "separation of powers principles defeat[]" the outcome of its standing analysis. *Id.* at 20. The court cannot cure its initial error with a belated and half-hearted discussion of the separation-of-powers considerations that should have informed its injury-in-fact analysis.

B

The Supreme Court has already rejected the majority's two-step approach, in which it considers standing first and the separation of powers later. In a string of decisions beginning in

1974, we held—"[o]ver strong dissent"—"that Members of Congress may have standing when" "they assert injury to their institutional power as legislators." *Raines*, 521 U.S. at 820 n.4. Recognizing that separation-of-powers considerations *did* bear on the justiciability of these suits, however, we developed a doctrine of "circumscribed equitable discretion" so we could dismiss some cases as nonjusticiable *even if* we found legislative standing. *Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999). "Keeping distinct our analysis of standing and our consideration of the separation of powers," we reasoned, allowed us to treat "congressional and private plaintiffs . . . alike for the purpose of determining their standing." *Id.*

The Supreme Court rejected that practice in *Raines*, and we set ourselves straight, until today. After *Raines*, we recognized that the Supreme Court was "unmoved by [our] concern" that "consideration of separation of powers issues would distort our standing analysis." *Id.* at 115 (internal quotation marks omitted). We then concluded that *Raines* "require[d] us to merge our separation of powers and standing analyses." *Id.* at 116. In other words, we rejected the circuit's bifurcated approach that asked (1) whether "[congressional] plaintiffs [would have] had standing to sue" if they were a private party, and then (2) whether the "separation of powers problems [the lawsuit] created" demanded that we dismiss the suit anyway. *Id.* at 115.

Despite that course correction, the court again today treats the separation of powers as a backstop on our jurisdiction—an atmospheric concern to be considered only after we decide that a congressional plaintiff has standing. *See* Maj. Op. at 18-37. The majority dutifully recites *Chenoweth*'s command to integrate separation-of-powers concerns into the standing analysis, but then goes on to *reject* the proposition that the

separation of powers is a "necessary part of [the] standing analysis." Maj. Op. at 21. The majority treats the Executive Branch's separation-of-powers concerns as free-floating objections, asking whether they negate the outcome of a standing analysis conducted oblivious to these concerns. But that approach is backwards, and it replicates this circuit's discredited pre-*Raines* effort to consider congressional standing in isolation from the separation of powers.

If the Court's first rebuke in *Raines* failed to convince us to take separation-of-powers concerns seriously, the second should have. Just a few short weeks ago, the Supreme Court vacated and remanded our decision in a different congressional subpoena case for failing to "take[] adequate account of the separation of powers principles at stake." *Trump v. Mazars USA, LLP*, No. 19-715, slip op. at 18, 20 (U.S. July 9, 2020). Still, the court once again expresses "skepticism" that separation-of-powers principles should guide its analysis. Maj. Op. at 20.

C

1

The majority's return to the D.C. Circuit's old way—a check-the-box approach to standing coupled with desultory review of the lawsuit's separation-of-powers implications—places effectively no limitations on Congress's ability to haul the Executive Branch into court. The majority concludes that the Committee suffered a "concrete" injury because McGahn "denied the Committee something to which it alleges it is entitled by law," *id.* at 13, but that reasoning is boundless. *Any* claim that Congress might bring against the Executive Branch alleges a deprivation of something to which Congress is entitled by law.

Consider just a few possibilities. Under the majority's reasoning, why couldn't Congress (or the House or the Senate or a committee) challenge any Executive Order that allegedly violated the Bicameralism and Presentment Clause? *See Chenoweth*, 181 F.3d at 113. Or any military action that allegedly violated the Declare War Clause? *See Campbell v. Clinton*, 203 F.3d 19, 19 (D.C. Cir. 2000). Or one of the Executive Branch's spending decisions that allegedly violated the Appropriations Clause? *See U.S. House of Representatives v. Mnuchin*, No. 19-5176 (D.C. Cir. Aug. 7, 2020) (Griffith, J., dissenting). Just as in this case, each hypothetical suit involves allegations that Congress has been denied something to which it is entitled by law—the prerogative to enact statutes, or to declare war, or to appropriate funds. The majority's stripped-down conception of standing authorizes Congress to bring all these suits and more.

Worse, if Congress or one of its chambers may sue the Executive Branch, "it must follow that the President may, by the same token, sue Congress." *Barnes v. Kline*, 759 F.2d 21, 46 (D.C. Cir. 1984) (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987). Under the majority's reasoning, whenever Congress passes a statute that the President believes invades his constitutional prerogatives, he could come into court to obtain a judicial declaration on that statute's constitutionality. And why stop at suits between the Legislative and Executive Branches? The D.C. Circuit could sue Congress for stripping its habeas jurisdiction over Guantanamo Bay by alleging that Congress deprived it of its jurisdiction. *Cf. id.*

Once the courthouse doors are open, there's no reason to expect the branches to be judicious about the suits they bring. Even the General Counsel for the House conceded that

allowing such interbranch suits poses a serious "floodgates problem." Oral Arg. Tr. 100:13; *see also id.* at 103:23. Given the majority's conclusion that a deprivation of a legal right satisfies Article III, I see no reason to exclude any of these cases from our jurisdiction. After all, each involves an institutional plaintiff alleging a deprivation of a constitutional prerogative. And because our standing analysis requires us to assume the plaintiff's success on the merits, we would have to entertain any claim alleging such a deprivation, no matter how outlandish. In short order, we could be forced to interpret constitutional provisions that have traditionally been interpreted by the political branches and "never before . . . by the federal courts," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974), and that courts should consider only "in the last resort, and as a necessity," *Raines*, 521 U.S. at 819 (internal quotation marks omitted).

That cannot be right. If "the concrete injury requirement has the separation-of-powers significance" that the Supreme Court has "always said" it has, *Lujan*, 504 U.S. at 577, then the answer to whether these injuries suffice for Article III standing must be a resounding "No." Components of the government cannot bring suit alleging that another branch has caused the "abstract dilution of institutional . . . power." *Raines*, 521 U.S. at 826. When a branch "asserts a 'right' that consists of the exercise of (or participation in the exercise of) a political power, *the business of the political branches is the very object of the dispute,* no matter with what degree of particularity the 'right' has been conferred." *Moore v. U.S. House of Representatives*, 733 F.2d 946, 958 (D.C. Cir. 1984) (Scalia, J., concurring in the judgment). If the political branches were deemed to have a judicially cognizable interest in the "powers that have been conferred upon them (whether specifically or vaguely) by Constitution or statute," our system of separated

powers would be reduced to a system of "judicial refereeship." *Id.* at 959.

The majority hints (but never says) that the denial of Congress's right to *information* is somehow more concrete than other deprivations of institutional rights. But as the majority opinion emphasizes, the reason that McGahn's refusal to testify harms the House is that it subverts the House's ability "to legislate, to conduct oversight," and "to impeach and remove a President." Maj. Op. at 3. Those injuries are allegations that the House's institutional prerogatives have been frustrated by the Executive Branch's assertion of absolute testimonial immunity. And those injuries are no more concrete than any other assertion that the Executive Branch has taken power from Congress, or that Congress has taken power from the President.

Thus, although the majority evaluates only the Committee's asserted *informational* harm, its reasoning sweeps far more broadly. And neither the court nor the Committee has offered any principled limitations on that sweep. Indeed, by refusing to resolve the companion case in *Mnuchin*, the full court passes on the chance to offer guidance about the outer limits of its reasoning. *See Mnuchin*, No. 19-5176, slip op. at 3-4 (Griffith, J., dissenting). Today's decision will leave future panels to assess these suits on a case-by-case basis, deciding whether the constitutional power that has allegedly been diluted strikes them as specific enough (or important enough) to intervene. All the while, the branches' ability to settle matters on their own will grind to a halt as they submit themselves to the D.C. Circuit's superintendence.

2

Even assuming that informational injuries are uniquely "concrete" and the majority's decision can be cabined to just

these disputes, the opinion still opens the courthouse doors to unending litigation. The court deems the dispute in today's litigation "discrete and limited," Maj. Op. at 27, but the Committee admitted before the panel that—if McGahn testified and the Committee disagreed with his assertions of executive privilege—it would seek further relief, perhaps through emergency motions, to compel him to talk. *See Comm. on the Judiciary v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) (*McGahn I*), *reh'g en banc granted sub nom. U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1228477 (D.C. Cir. Mar. 13, 2020). Today's decision invites that litigation, establishing the D.C. Circuit as the continuous monitor of congressional oversight hearings.

Supervising these hearings and other information disputes will be an unhappy task for judges who value the public perception of impartiality. Because "congressional subpoenas for [executive-branch] information unavoidably pit the political branches against one another," *Mazars*, slip op. at 15, entertaining these suits will invariably put us in the "awkward position" of choosing a winner in repeated contests of power and privilege, *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389 (2004). We will be forced to balance "the Executive's claims of confidentiality and autonomy" against Congress's asserted need for information. *Id.* And we will have to make such decisions about records and testimony "of intense political interest for all involved." *Mazars*, slip op. at 17. Resolving these disputes will not just threaten the neutrality of the Judiciary; it will require the branches to submit to *our* views of *their* constitutional prerogatives on *our* timeline. Nobody wins when we place "the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership." *United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting).

11

II

Unlike the majority, I would integrate the separation-of-powers considerations into the standing analysis. As I have already explained, this dispute is neither "consistent with a system of separated powers" nor "traditionally thought to be capable of resolution through the judicial process." *McGahn I*, 951 F.3d at 516 (quoting *Allen*, 468 U.S. at 752). Accordingly, as discussed at length in the panel opinion, it must be dismissed.

Once again, the Judiciary cannot resolve pure interbranch disputes. Federal courts primarily sit "to decide on the rights of individuals," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803), and our core function is "to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law," *Summers*, 555 U.S. at 492. To be sure, that task sometimes requires us to resolve deeply controversial political disputes. But we resolve those disputes "only in the last resort, and as a necessity in the determination of [a] real, earnest, and vital controversy between individuals." *Chicago & G.T. Ry. v. Wellman*, 143 U.S. 339, 345 (1892). Because we address such disputes only "in the course of carrying out the judicial function" of resolving cases or controversies, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006), we cannot intervene in an interbranch dispute unless and until the actions of one of the branches harms an entity "beyond the [Federal] Government," *Raines*, 521 U.S. at 834 (Souter, J., concurring in the judgment).

It is no accident that every major separation-of-powers case to reach the Supreme Court in the Nation's history fits exactly that pattern. In *Marbury v. Madison*, William Marbury sought his "commission as a justice of the peace." 5 U.S. at 154. *Humphrey's Executor* arose because William Humphrey's

estate sought to collect backpay after President Roosevelt fired Humphrey. 295 U.S. 602, 618-19 (1935). In *INS v. Chadha*, Jagdish Rai Chadha—a man admitted to the United States on a student visa—sought to remain in the country. 462 U.S. 919, 923 (1983). *United States v. Nixon* arose out of a judicial subpoena issued in the "regular course of [the] federal criminal prosecution" of seven Watergate burglars. 418 U.S. 683, 687, 697 (1974). And both *Free Enterprise Fund* and *Seila Law* involved private companies subject to government investigations. *Seila Law LLC v. CFPB*, No. 19-7, slip op. at 6 (U.S. June 29, 2020); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010); *see also McGahn I*, 951 F.3d at 520-21 (listing other separation-of-powers cases that all involved the "concrete interests of private actors").

Neither the Committee nor the court identifies a single example of a direct interbranch dispute—on any issue—resolved by the Supreme Court. Ever. The Supreme Court's explanation in *Raines* remains true today: History is replete with "confrontations between one or both Houses of Congress and the Executive Branch," but until recently, "no suit was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826. If a chamber of Congress could sue the Executive Branch to enforce its institutional prerogatives—be it the right to participate in appointments, or the right to vote to go to war—the U.S. Reports should be littered with these claims. They are not.

The same is true of the subset of interbranch disputes at issue here: conflicts about *information*. Since the Founding, "congressional demands for [executive-branch] information have been resolved by the political branches without involving [the] [c]ourt[s]." *Mazars*, slip op. at 9. The only remotely similar dispute that the Supreme Court has ever addressed involved the rights of private parties; *Mazars* was brought by

"the President in his *personal capacity*" and "his children and affiliated businesses" against a third-party accounting firm. *Id.* at 5 (emphasis added). Altogether, the "complete novelty of the direct intermediation of the courts in disputes between the President and the Congress[] ought to give us pause." *Barnes*, 759 F.2d at 41 (Bork, J., dissenting).

But as with the separation of powers, the majority dismisses this history as extraneous to the standing analysis, suggesting that the Supreme Court has never "append[ed]" a "historical prong" to the three-part standing test elucidated in *Lujan*. Maj. Op. at 34. No, there is no fourth prong, but in determining whether a "harm constitutes [an] injury in fact," "history . . . play[s an] important role[]." *Spokeo*, 136 S. Ct. at 1549. The Supreme Court has repeatedly emphasized that Article III limits us to adjudicating claims "traditionally thought to be capable of resolution through the judicial process." *Allen*, 468 U.S. at 752 (internal quotation marks omitted); *see also Lujan*, 504 U.S. at 559-60 (explaining that our jurisdiction "depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts"); *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019); *Raines*, 521 U.S. at 818-20; *Flast v. Cohen*, 392 U.S. 83, 97 (1968). How else could we identify the "traditional" limits on our jurisdiction without consulting that history?

And the best history that the majority can muster is four decisions all within the last forty-five years—two in this circuit, two in the district court. *See* Maj. Op. at 23-24. But "[t]hese few scattered examples . . . shed little light" on the constitutionality of judicial resolution of interbranch disputes. *Seila Law*, slip op. at 19 (internal quotation marks omitted). The majority professes itself untroubled by the rarity and recency of these historical examples, speculating that perhaps

a "long tradition of Presidential cooperation" minimized the need for such suits in the past. Maj. Op. at 36. But Presidents of all stripes—including Washington, Adams, Jefferson, Monroe, Lincoln, Theodore Roosevelt, Franklin Roosevelt, Truman, Carter, Reagan, Bush, and Obama—withheld information from Congress during their presidencies. *See Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 5-7 (D.D.C. 2013); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 57-64 (D.D.C. 2008); *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 751-81 (1982).

It is the majority's view that is the outlier. For years, the political branches *agreed* to resolve their interbranch information disputes with negotiation rather than litigation. Even setting aside the nearly unbroken history of political resolution of interbranch information disputes leading up to our adventurous decisions in the 1970s, the political branches have each recently opposed the majority's conclusion. For instance, the Bush and Obama Administrations both resisted judicial resolution of these disputes. *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 30, *Comm. on Oversight & Reform v. Holder*, No. 12-cv-1332 (D.D.C. Oct. 15, 2012), Dkt. No. 13-1 (President Obama); Mem. in Supp. of Def.'s Mot. to Dismiss at 24, *Comm. on the Judiciary v. Miers*, No. 08-cv-0409 (D.D.C. May 9, 2008), Dkt. No. 16-1 (President Bush).

And despite the Committee's current litigating position, Congress has also long agreed that these disputes are not fit for judicial resolution. During the Watergate impeachment investigation of President Nixon, for instance, the Committee on the Judiciary concluded that it "would be inappropriate to seek the aid of the courts to enforce its subpoenas against the President." H.R. REP. NO. 93-1305, at 210 (1974). "The Committee's determination not to seek to involve the judiciary

reflected not only an intent to preserve the constitutional structure, but also the high probability that the courts would decline to rule on the merits of the case because it is . . . *not the kind of controversy courts traditionally resolve*." *Id.* at 210-11 (emphasis added) (internal quotation marks omitted).

The statutory regime for judicial enforcement of congressional subpoenas reflects this same judgment. Only the Senate has express statutory authority to enforce a subpoena in federal court, *see* 2 U.S.C. § 288d; *In re U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 & n.28 (D.C. Cir. 1981), but not if the suits involve executive-branch assertions of "governmental privilege," 28 U.S.C. § 1365(a). As the law's sponsors explained, the statute's "purpose is to keep disputes between the executive and legislative branches out of the courtroom." 142 CONG. REC. 19412 (1996) (statement of Sen. Specter); *see also id*. at 19413 (statement of Sen. Levin) (similar). This case is just such a controversy; McGahn's sole argument on the merits is that "Congress may not constitutionally compel the President's senior advisers"— like McGahn—"to testify about their official duties." McGahn Panel Br. 47 (internal quotation marks omitted).

By privileging four recent lower-court decisions over 200 years of tradition, the majority "needlessly disturb[s] the compromises and working arrangements that [the] branches themselves have reached." *Mazars*, slip op. at 11 (cleaned up). "Congress and the Executive have . . . managed for over two centuries to resolve [information] disputes among themselves without the benefit of guidance from [the courts]." *Id.* The majority protests that its decision actually "preserv[es]" "the *status quo ante* between the branches," Maj. Op. at 30, but that assertion is doubly wrong. The paucity of historical analogues to this suit belies the claim that the majority's decision reflects the status quo. And the majority's defense of congressional

standing does not preserve but displaces the system of accommodation that *is* the status quo. With litigation on the table, neither side has an incentive to cooperate. "Instead of negotiating over information requests," Congress or the Executive Branch "could simply walk away from the bargaining table" and force a resolution by judges. *Mazars*, slip op. at 16. The inevitable result is that we will become courts not of last but of first resort.

## III

Sometimes the temptation to wrongly expand our jurisdiction stems from "the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines*, 521 U.S. at 820. But here, the full court hurdles over Article III's barriers only to decline to resolve the case. The majority remands the case to the panel to decide whether the Committee has a cause of action and whether it should prevail on the merits. Congress has already waited over fourteen months for a resolution; the court tells it to hurry up and wait some more. As in *Mnuchin*, I cannot agree with my colleagues' decision to force the political branches to wait patiently while we work our way through these important cases. *See Mnuchin*, slip op. at 3-4 (Griffith, J., dissenting). I would hold that the Committee lacks a cause of action to prosecute its case against McGahn.

## A

In addition to demonstrating standing, the Committee must also show that it has a cause of action that supports an injunction compelling McGahn to testify. Our case law forecloses that argument.

"Prior to 1978 Congress had only two means of enforcing compliance with its subpoenas: [1] a statutory criminal contempt mechanism and [2] the inherent congressional contempt power." *In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d at 1238 (footnote omitted). Neither means allowed for judicial enforcement of a subpoena. "Responding to this deficiency, Congress enacted [a] mechanism for civil enforcement of *Senate* subpoenas" in 1978. *Id.* (emphasis added). That law allows "the Senate [to] request a court order requiring [an] individual to comply with [a] subpoena." *Id.* By my count, that comes to just *three* "means of enforcing compliance with [congressional] subpoenas"—a criminal contempt proceeding, an inherent contempt proceeding, and a civil suit authorized by statute. *Id.* But the statute that Congress passed in 1978 "does not . . . include civil enforcement of subpoenas by the House of Representatives." *Id.* at 1238 n.28. And Congress has passed no further statutes authorizing the House to bring such suits. Because the D.C. Circuit has identified only these three ways for Congress to enforce compliance with its subpoenas, that precedent forecloses the Committee's efforts to litigate this case.

B

Even if the panel were not bound by this precedent on remand, the Committee would still lack a cause of action. The Committee argues that it has an implied cause of action under Article I, that it can invoke the traditional power of courts of equity to enjoin unlawful executive action, and that the Declaratory Judgment Act provides a separate basis for this suit. None suffices.

Start with Article I. The Committee argues that it is "entitled under Article I to seek equitable relief to enforce a

subpoena . . . issued in furtherance of its constitutional power of inquiry." Committee Panel Br. 34 (internal quotation marks omitted). But time and again, the Supreme Court has warned federal courts to hesitate before implying causes of actions—whether from a congressional statute or from the Constitution. *See, e.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). "When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis," *Ziglar*, 137 S. Ct. at 1857, and usually Congress "should decide" whether to authorize a lawsuit, *id.* (internal quotation marks omitted).

In this case, Congress has *declined* to authorize lawsuits like the Committee's twice over. First, Congress has granted an express cause of action to the Senate—but not to the House. *See* 2 U.S.C. § 288d. Second, the Senate's cause-of-action statute expressly *excludes* suits that involve executive-branch assertions of "governmental privilege." 28 U.S.C. § 1365(a). The expression of one thing implies the exclusion of the other, and authorizing the Committee to bring its lawsuit would conflict with *two* separate limitations on civil suits to enforce congressional subpoenas. We should not read these carefully drafted limitations out of the statute books.

The Committee suggests that—even if Article I alone doesn't provide a cause of action—the court may exercise its "traditional equitable powers" to grant relief. *Ziglar*, 137 S. Ct. at 1856. But those powers remain "subject to express and implied statutory limitations," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and are further limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Again, "implied statutory

19

limitations" foreclose suits by the House and suits that implicate a governmental privilege; this one checks both boxes.

Anyway, there's nothing "traditional" about the Committee's claim. The Committee cannot point to a single example in which a chamber of Congress brought suit for injunctive relief against the Executive Branch prior to the 1970s. Interbranch suits "lie[] far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement." *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment). While equity may be "flexible," "that flexibility is confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano*, 527 U.S. at 322. We cannot simply reference "equity" to justify a vast expansion of our authority to enforce congressional subpoenas.

Finally, the Committee claims that the Declaratory Judgment Act allows it to bring suit. *See* 28 U.S.C. § 2201(a). This argument is even less persuasive. The Declaratory Judgment Act does not itself "provide a cause of action," as the "availability of declaratory relief presupposes the existence of a judicially remediable right." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (cleaned up); *see also C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002). That statute is "procedural only" and simply "enlarge[s] the range of remedies available in the federal courts." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (internal quotation marks omitted). Because Article I does not create a "judicially remediable right" to enforce a congressional subpoena, the Committee cannot use the Declaratory Judgment Act to bootstrap its way into federal court. Thus, even if the Committee could establish the standing necessary to "get[] [it] through the courthouse door, [that] does not keep [it] there." *Make the Road N.Y. v. Wolf*, 962 F.3d 612,

631 (D.C. Cir. 2020). Without a cause of action to sustain it, the Committee's suit must be dismissed.

IV

The majority's opinion is a Pyrrhic victory for Congress. Courts have many virtues, but dispatch is not one of them. "To the extent that enforcement of congressional subpoenas is left to the courts, future administrations [will] now know that they can delay compliance for years," all while avoiding the traditional political cost associated with refusing to negotiate with Congress in good faith. Josh Chafetz, *Executive Branch Contempt of Congress*, 76 U. CHI. L. REV. 1083, 1154 (2009).

This case, and its unresolved companion in *Mnuchin*, illustrates the costs of delay. Despite agreeing to hear this case on an expedited schedule, more than fourteen months have passed since the House issued its subpoena. Yet final resolution of the Committee's claim is nowhere in sight. And bear in mind that the majority says that this case presents a "discrete and limited" legal question. Maj. Op. at 27. How much longer will it take the courts to decide more intricate questions of power and privilege? The fact is that Congress has *never* successfully obtained information from an executive-branch official in a lawsuit. Indeed, our circuit previously declined to expedite the appeal of a legislative subpoena case because it could not be "fully and finally resolved by the Judicial Branch—including resolution by a panel and possible rehearing by this court en banc and by the Supreme Court—before [that] Congress end[ed]" and its subpoenas "expir[ed]." *Comm. on the Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008).

And the majority's decision to open the courthouse doors to these futile lawsuits comes at a serious cost. The option of

litigation weakens Congress's ultimate lever of accountability: its impeachment power. In the past, the House Judiciary Committee has treated the Executive Branch's failure to cooperate in an investigation as grounds for an impeachment. *See* H.R. REP. NO. 116-346, at 155 & n.906 (2019) (President Trump); H.R. RES. NO. 93-625 (1973) (President Nixon). But once litigation is a viable option, the President can always defend against accusations of executive-branch stonewalling by turning around and reproaching Congress for bypassing the courts—just as the President did here. *See Trial Memorandum of President Donald J. Trump, In Proceedings Before the United States Senate* 49, 53 (Jan. 20, 2020). Today's decision thus grants Congress the sluggish remedy of judicial superintendence only to blunt the most potent weapon in its arsenal.

The court seems to think that the alternative—leaving these disputes to the traditional process of negotiation and accommodation—is even worse. But Congress has powerful and varied tools to deal with a recalcitrant Executive Branch. It may withhold appropriations, refuse to confirm presidential nominees, prevent the President from implementing his legislative agenda, and wield public opinion against the President. At the extreme, the Legislative Branch may hold uncooperative officers in contempt of Congress or even impeach them.

The majority worries that these political remedies are "impracticable," Maj. Op. at 34, and it offers judicial enforcement as a supplement. But judicial involvement cannot solve Congress's problems when political tools fail. Courts cannot ensure that the Legislative Branch gets timely access to information from a dilatory Executive Branch; we take too long. Courts also cannot intervene without displacing the centuries-old system of negotiation, accommodation, and

(sometimes) political retaliation; one party or the other—likely an Executive Branch that benefits from delay—will walk away from the bargaining table and force litigation. And even if Congress eventually prevails in court, we cannot be sure that a "President [who] loses the lawsuit"—having already defied Congress and withstood political pressure—will "faithfully implement the [c]ourt's decree." *Windsor*, 570 U.S. at 791 (Scalia, J., dissenting).

Worst of all, we cannot offer the political branches the remedy of judicial enforcement without squandering the precious reserve of public confidence that makes our judgments efficacious in the first place. Article III's limitations are for the other branches' protection, but they are for our protection too. Parties respect neither our "force" nor our "will" but our "judgment." FEDERALIST NO. 78 (Alexander Hamilton). If we venture into this increasingly politicized territory, we risk undermining that neutrality and losing the public's trust. We do neither ourselves nor the parties any favors by embarking down this path, and I would leave the political branches to resolve their disputes through the political process—as the Constitution demands. Respectfully, I dissent.