# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 18, 2020      Decided September 25, 2020
Reheard En Banc April 28, 2020
Remanded to Panel August 7, 2020

No. 19-5176

UNITED STATES HOUSE OF REPRESENTATIVES,
APPELLANT

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00969)

———

*Douglas N. Letter*, General Counsel, U.S. House of
Representatives, argued the cause for appellant. With him on
the briefs were *Todd B. Tatelman*, Principal Deputy General
Counsel, *Megan Barbero* and *Josephine Morse*, Deputy
General Counsel, *Adam A. Grogg* and *William E. Havemann*,
Associate General Counsel, *Kristin A. Shapiro*, Assistant

General Counsel, and *Carter G. Phillips*, *Virginia A. Seitz*, *Joseph R. Guerra*, and *Christopher A. Eiswerth*.

*Lawrence S. Robbins*, *D. Hunter Smith*, and *Megan Browder* were on the brief for *amici curiae* Former General Counsels of the U.S. House of Representatives in support of appellants and reversal. *Alan E. Untereiner* entered an appearance.

*Irvin B. Nathan*, *Robert N. Weiner*, *Andrew T. Tutt*, and *Samuel F. Callahan* were on the brief for *amici curiae* Former Members of Congress in support of appellant.

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Hashim M. Mooppan*, Deputy Assistant Attorney General, and *Mark R. Freeman* and *Courtney L. Dixon*, Attorneys.

*Lawrence J. Joseph* was on the brief for *amicus curiae* Rep. Andy Barr in support of appellees and affirmance.

*Miles L. Terry*, *Benjamin P. Sisney*, *Jay Alan Sekulow*, *Andrew J. Ekonomou*, and *Jordan A. Sekulow* were on the brief for *amicus curiae* The American Center for Law and Justice in support of appellees.

Before: MILLETT and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: The United States House of Representatives brought this lawsuit alleging that the Departments of Defense, Homeland Security, the Treasury, and

the Interior, and the Secretaries of those departments violated the Appropriations Clause of the Constitution as well as the Administrative Procedure Act when transferring funds appropriated for other uses to finance the construction of a physical barrier along the southern border of the United States, contravening congressionally approved appropriations. The District Court for the District of Columbia held that it had no jurisdiction because the House lacked standing to challenge the defendants' actions as it did not allege a legally cognizable injury. We disagree as to the constitutional claims and therefore vacate and remand for further proceedings.

**I.**
**A.**

On review of a district court's dismissal for lack of jurisdiction, we make legal determinations *de novo*. *See Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016). As a result, we consider anew whether the House established that it has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In doing so, we "'accept as true all material allegations of the complaint,' [and] draw[] all reasonable inferences from those allegations in plaintiffs' favor." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Additionally, in assessing standing, we assume the House is correct on the merits of the underlying claims. *Id.* Applying that framework to the House's complaint, we assume the following facts:

After protracted disagreement and negotiation between President Trump and the House of Representatives over the President's request for appropriation to erect a physical barrier along the boundary between the United States and Mexico, Congress enacted a budget resolution which included an appropriation of $1.375 billion "for the construction of primary

pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." Pub. L. No. 116-6, § 230(a)(1), 133 Stat. 13, 28. The legislation also restricted construction in certain areas, *id.* § 231, 133 Stat. at 28, and limited the construction to "operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017 (Public Law 115–31), such as currently deployed steel bollard designs," *id.* § 230(b), 133 Stat. at 28.

The President signed the bill but announced that he planned to "us[e] his legal authority to take Executive action to secure additional resources" beyond the funding appropriated by Congress and signed into law by the President. J.A. 151. He identified three specific sources for the additional funds: the Treasury Forfeiture Fund, Department of Defense funds appropriated for the Support of Counterdrug Activities (10 U.S.C. § 284), and Department of Defense funds allocated for other construction projects (10 U.S.C. § 2808). The House's complaint contests only the latter two sources. Compl. at 39–45, *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) (ECF No. 1); Am. Compl. at 41–50, *U.S. House*, 379 F. Supp. 3d 8 (ECF No. 59). We note that the uncontested source did not supply sufficient funds to cover the allegedly unlawful expenditure, and therefore the presence of the uncontested funds does not moot the case.

## B.

On April 5, 2019, the House filed this action seeking declaratory and injunctive relief from the transfers of funds carried out by the Departments of Defense, Homeland Security, the Treasury, and the Interior, and the Secretaries of those departments (defendants), alleging that the defendants' actions violated the Appropriations Clause of the Constitution and the Administrative Procedure Act. Fundamentally, the House's

position is that Congress authorized the defendants to spend $1.375 billion, and only $1.375 billion, for construction of a barrier, but the defendants are attempting to spend $8.1 billion. *See* Compl. ⁋⁋ 58–59. According to the complaint, the defendants' "expenditure of unappropriated funds disregards the separation of powers and usurps Congress's exclusive authority under the Appropriations Clause to control federal funds." *Id.* ⁋ 58.

Specifically, the complaint alleged that the defendants violated the Appropriations Clause of the Constitution, U.S. Const. art. I, § 9, cl. 7, by transferring additional funds to spend on construction, and that they cannot justify their violation of the appropriations law by relying on 10 U.S.C. § 284, on § 8005 of the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 2999 (DOD Appropriations Act), or on 10 U.S.C. § 2808, because those statutes do not authorize transfers of funds in these circumstances. Additionally, the House alleges that transfers of funds made pursuant to § 8005 of the DOD Appropriations Act violated the Administrative Procedure Act because they were not in accordance with law. The amended complaint, filed after the district court dismissed the first complaint, added allegations that the transfer of funds under § 9002 of the DOD Appropriations Act also violated the Administrative Procedure Act.

The first of the contested sources of additional funding is the Counterdrug Activities fund. Under 10 U.S.C. § 284, the Secretary of Defense "may provide support for the counterdrug activities or activities to counter transnational organized crime of any other department or agency." The DOD Appropriations Act provided $517.171 million for counterdrug activities. DOD Appropriations Act, Pub. L. No. 115-245, 132 Stat. 2981,

2997.  When the House filed suit, it believed that most of the appropriated funds had already been used.  Compl. ℙ 62.  As a result, to draw from this fund for barrier construction, the Executive Branch would need to transfer "working capital funds of the Department of Defense or funds made available" in the DOD Appropriations Act "between such appropriations or funds or any subdivision thereof."  2019 DOD Appropriations Act § 8005; *see also id.* at § 9002.  The statute allows such transfers if the transfers meet certain requirements.  2019 DOD Appropriations Act § 8005; *see also id.* at § 9002.  The President made two transfers relying on §§ 8005 and 9002:  On March 25, 2019, the President transferred $1 billion, J.A. 177–79, and on May 9, 2019, the President transferred an additional $1.5 billion, J.A. 226–34.

The second contested source of additional funding is the reallocation of funds under 10 U.S.C. § 2808.  The President planned to reallocate $3.6 billion citing his authority under § 2808.  J.A. 151.  Section 2808(a) allows the Secretary of Defense to "undertake military construction projects" when the President declares a national emergency that "requires [the] use of the armed forces" and the construction projects are "necessary to support such use of the armed forces."  On February 15, 2019, the President declared a national emergency, which Congress did not override.  *See* Proclamation No. 9844, 84 Fed. Reg. 4949.

Shortly after filing the complaint, the House moved for a preliminary injunction, which the defendants opposed.  The district court denied the motion, holding that the House lacked standing because it was not injured.  Following the order dismissing the action, the House moved to amend its complaint to include a request for injunctive relief for the transfer of funds under § 9002 of the 2019 DOD Appropriations Act.  On June 17, 2019, the district court permitted the amendment, held that

the House lacked standing for the same reasons articulated in its original memorandum dismissing the suit, and entered final judgment. On June 18, the House filed a notice of appeal. *See generally U.S. House*, 379 F. Supp. 3d 8.

## C.

Under Article III of the Constitution, federal courts are courts of limited jurisdiction. U.S. Const. art. III, § 2, cl. 1; *see, e.g.*, *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). They are empowered only to hear "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. The case-or-controversy requirement for justiciability involves certain constitutional minima, one of which is standing. *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020). To establish standing, the injured party must demonstrate that it has an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560 (citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The injury must be "fairly . . . trace[able] to the challenged action of the defendant" and the injury must be redressable by a favorable decision by the court. *Id.* at 560–61 (alternation in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Appellees contend that appellant has not established the issue of injury in fact. *U.S. House*, 379 F. Supp. 3d at 13.

The House, as the party invoking federal jurisdiction, bears the burden of demonstrating that it has an injury. *Lujan*, 504 U.S at 561. "[T]he manner and degree of evidence required" to show injury changes based on the "stage[] of the litigation." *Id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct

may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). As with the plaintiff in *Food & Water Watch, Inc. v. Vilsack*, the House filed a complaint and a motion for preliminary injunction. Defendants moved to dismiss. The House's assertion of injury should be evaluated under the motion to dismiss standard. 808 F.3d 905, 913 (D.C. Cir. 2015). We review the issue of standing *de novo*. *Id.*

Before this court, the House maintains that it has suffered a concrete injury and thus has standing to contest the Executive's self-appropriation of funds described above. In its brief, the House distills Supreme Court precedent on legislative standing to two factors: (1) the institution must suffer an institutional injury, which the House describes as events that cause a "disruption of [a legislative] body's specific powers," House Br. at 20 (alteration in original) (quoting *Tenn. ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 511 (6th Cir. 2019)), and (2) "there must be a match 'between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned [the impugned] authority,'" *id.* (alteration in original) (quoting *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019)).

The House alleges that it has suffered an institutional injury because the defendants' actions have disrupted Congress's specific authority over the appropriation of federal funds. *Id.* at 23–24. Congress's authority is derived from the Appropriations Clause, U.S. Const. art I, § 9, cl. 7, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." The House suggests that the structure of the Appropriations Clause means that Congress, as an institution, has the specific

authority to decide how federal funds are allocated and, when the defendants transferred more funds to be spent on construction of the barrier than Congress had authorized, the defendants disrupted congressional authority. *Id.* at 24. The defendants assert that the House of Representatives is not an injured party with standing to litigate this injury in federal court, but that any alleged injury is to the legislative right of Congress as a whole, not the entity comprising a single house of the bicameral body. Thus, the defendants' first line of defense is that a single house of Congress can never have standing to litigate a claim of legislative injury against the Executive, even though each house has a specific authority to prevent the authorization.

The House answers that there is no mismatch between the institution injured and the institution bringing the lawsuit. According to the House, while the Appropriations Clause grants the power to both chambers of Congress in limiting the spending of federal funds, each chamber also possesses a unique interest in appropriations. That interest, the House argues, stems from the nature of appropriations, namely, that appropriations legislation must be passed, "otherwise the government literally cannot function." *Id.* at 25. As a result, the House suggests that each chamber has "the power to dictate funding limits" because if either chamber does not pass an appropriation, there will be no funds for the federal government to spend on the project or goal to which the proposed appropriation is directed. *Id.* at 26.

In support of its position that each chamber has a distinct interest, the House relies on statements from the founding era. In particular, the House turns to the history of the passage and amendment of the Appropriations Clause. In an early draft of the Constitution, all appropriation bills had to originate in the House and could not be altered by the Senate. *See* 2 *The*

*Records of the Federal Convention of 1787*, at 131 (M. Farrand ed., 1911) (hereinafter *Records*); House Br. at 26–27. The origination provision was removed, the House asserts, because it made the Senate subservient to the House in appropriations and the Framers intended that each chamber would have the independent ability to limit spending. Additionally, the House references statements from the founding era that recognize the federal purse has "two strings" and "[b]oth houses must concur in untying" them. 2 *Records* at 275. The structure of the "two strings" system means, the House maintains, that the House, by not passing an appropriation, can prevent the expenditure of funds for a government project, such as the proposed border wall even if the Senate disagrees. In sum, as the House asserts, "unlike the situation in which one chamber of Congress seeks to enforce a law that it could not have enacted on its own, a suit to enforce a spending limit vindicates a decision to block or limit spending that each chamber of Congress could have effectively imposed—and, in this case, the House did impose—unilaterally." House Br. at 27–28.

## II.
### A.

At the time this appeal was initiated, the appellees argued that there was no controlling precedent directly on point as to the question of whether a single chamber could ever have standing. After the oral arguments in this case, this court accepted for en banc review another case involving the question whether the Constitution categorically denies the House standing to sue the Executive Branch. *See McGahn*, 968 F.3d 755 (D.C. Cir. 2020). The en banc court has now rendered its decision in *McGahn* and returned this case to the original panel for disposition. The *McGahn* court clearly held that a single house of Congress could have standing to pursue

litigation against the Executive for injury to its legislative rights. *Id.* at 778.

Underlying the present litigation is a dispute about the nature of Congress's authority under the Appropriations Clause of the Constitution and whether the President's refusal to follow the limits on his authority injures one House of Congress. The Constitution provides, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because the clause is phrased as a limitation, it means that "the expenditure on public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion) (citing *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1851)). The Appropriations Clause, thus, provides one foundational element of the separation between the powers of the sword of the Executive Branch and the purse of the Legislative Branch. It is a core structural protection of the Constitution—a wall, so to speak, between the branches of government that prevents encroachment of the House's and Senate's power of the purse. *See Freytag v. Comm'r*, 501 U.S. 868, 878 (1991) ("Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch."); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) ("The Framers created a structure . . . giving each branch 'the necessary constitutional means, and personal motives, to resist encroachments of the others[.]'") (quoting *The Federalist* No. 48 at 333; and No. 51 at 349 (J. Madison)) (internal citations omitted); *cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) ("[T]he doctrine of separation of powers is a *structural safeguard* . . . . establishing high walls and clear distinctions.") (emphasis in original).

The separation between the Executive and the ability to appropriate funds was frequently cited during the founding era as the premier check on the President's power. In fact, "the separation of purse and sword was the Federalists' strongest rejoinder to Anti-Federalist fears of a tyrannical president." Josh Chafetz, *Congress's Constitution, Legislative Authority and the Separation of Powers* 57 (2017); *see also* 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 367 (Jonathan Elliot ed., 2d ed. 1836) (hereinafter *Debates*) (responding to charges that the President could easily become king by explaining that "[t]he purse is in the hands of the representatives of the people"). For example, James Madison, in the Federalist Papers, explained, "Th[e] power over the purse may in fact be regarded as the most compleat and effectual weapon with which any constitution can arm the immediate representatives of the people . . . ." *The Federalist* No. 58 at 394 (J. Madison) (Jacob E. Cooke ed., 1961). At the New York ratification convention, Alexander Hamilton reassured listeners, stating, "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *Debates* 349.

As evidenced by the quotations above, a repeated theme in the founding era was the importance of putting the power of the purse specifically in the hands of the "representatives of the people." *The Federalist* No. 58 at 394 (J. Madison) (Jacob E. Cooke ed., 1961); 2 *Debates* 393. As noted above, an early draft of the Constitution went as far as to require appropriations bills originate in the House of Representatives, the representatives of the people. 2 *Records* 131. While the final text does not include that same origination provision and provides only that "[a]ll bills for raising Revenue shall originate in the House of Representatives," U.S. Const. art. I, § 7, cl. 1, "[u]nder immemorial custom the general appropriations bills . . . originate in the House of

Representatives." *Cannon's Procedure in the House of Representatives* 20, § 834 (4th ed. 1944). In fact, "the House has returned to the Senate a Senate bill or joint resolution appropriating money on the ground that it invaded the prerogatives of the House." Wm. Holmes Brown, *House Practice* 71 (1996); *see also* 3 *Deschler's Precedents* 336 (1976). The appropriations statute at issue in this case originated with the House, as is traditional. 165 Cong. Rec. H997 (daily ed. Jan. 22, 2019); 165 Cong. Rec. H1181–83 (daily ed. Jan. 24, 2019).

While custom cannot create an interest sufficient to establish standing, it can illustrate the interest of the House in its ability, as discussed above, to limit spending beyond the shared ability of the Congress as a whole.

**B.**

In cases before the *McGahn* decision of this court, the Supreme Court considered the question of what constitutes an injury to a legislature at several points in history. This court has also considered the issue of legislative standing. Four foundational Supreme Court opinions outline the circumstances that can constitute legislative injury. The district court discussed three of the four. The fourth was released after the district court's memorandum decision.

We turn, first, to *Coleman v. Miller*, 307 U.S. 433 (1939), in which the Supreme Court determined that there was a legislative injury. In *Coleman*, the Kansas legislature voted on whether to ratify the Child Labor Amendment to the U.S. Constitution. *Id.* at 435–36. Twenty of the forty state senators voted to ratify the amendment and twenty voted against ratification. *Id.* at 436. The Lieutenant Governor broke the tie and voted to ratify the amendment. *Id.* Twenty senators and

three members of the Kansas House of Representatives brought suit in Kansas state court challenging the Lieutenant Governor's authority to cast the deciding vote. *Id.* The suit made its way to the Supreme Court. The Court held that the "senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes," thus "com[ing] directly within the provisions of the statute governing [the Supreme Court's] appellate jurisdiction" because the Lieutenant Governor's tie-breaking vote meant that the senators' votes had been "overridden and virtually held for naught." *Id.* at 438. In particular, the Supreme Court noted that the plaintiffs had "an adequate interest to invoke" federal jurisdiction because the injury was more concrete and particularized than an injury to a "right possessed by every citizen" and the votes of the twenty senators "would have been decisive in defeating the ratifying resolution." *Id.* at 438, 440–41. Since it was decided, *Coleman* has come to stand for the idea that action that "nullified" legislative power can establish a legislative injury. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 803 (2015) (quoting *Raines v. Byrd*, 521 U.S. 811, 823 (1997)).

Next, in *Raines v. Byrd*, 521 U.S. 811 (1997), the Supreme Court determined there was no legislative injury. In *Raines*, four senators and two representatives sued the Secretary of the Treasury and the Director of the Office of Management and Budget alleging that the Line Item Veto Act, which was passed over the objections of the six Members of Congress, was unconstitutional. 521 U.S. at 814. While the Act provided that "[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action, in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution," the Members of Congress were still required to show an injury in fact to

establish constitutional injury. *Id.* at 815–16, 818–19 (alteration in original). The Members of Congress described that injury as a "diminution of legislative power." *Id.* at 821. The Supreme Court held, however, that the alleged injury was not sufficient to establish legislative standing. *Id.* at 829–30. While nullification is a theory that has supported a determination of injury, in this case, the Supreme Court noted, "[t]here is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power." *Id.* at 826.

Additionally, and equally important, the Supreme Court explained, the "appellees have alleged no injury to themselves as individuals" and the potential institutional injury, diminution of power, was "wholly abstract and widely dispersed" among the other Members of Congress. *Id.* at 829. The opinion also "attach[ed] some importance to the fact that appellees [were not] authorized to represent their respective Houses of Congress in th[at] action, and indeed both Houses actively oppose[d] their suit." *Id.* It was, therefore, significant that the plaintiffs were individual Members of Congress attempting to vindicate the rights of Congress as a whole. The Supreme Court made clear that *Raines* involves the standing of individual legislators, not of legislative institutions. *See Bethune-Hill*, 139 S. Ct. at 1953 (citing *Raines* for the proposition that "individual members lack standing to assert the institutional interests of a legislature"); *Arizona State Legislature*, 576 U.S. at 801–02 ("In *Raines*, this Court held that six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act."). Similarly, this court has also held that there was no standing for individual Members of Congress in suits against the Executive. *See Campbell v. Clinton*, 203 F.3d 19, 22–24 (D.C. Cir. 2000); *Chenoweth v. Clinton*, 181 F.3d 112, 117 (D.C. Cir. 1999). In *Campbell*, thirty-one individual Members of Congress "filed suit claiming

that the President violated the War Powers Resolution and the War Powers Clause of the Constitution by directing U.S. forces' participation" in a NATO campaign in Yugoslavia. 203 F.3d at 19–20. We held that they did not have standing to pursue either the statutory or the constitutional claims. *Id.* at 22–24. For the constitutional claim, our analysis was influenced by the fact that the President has war powers independent of those of Congress and "did not claim to be acting pursuant to the defeated declaration of war or a statutory authorization, but instead 'pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander-in-Chief and Chief Executive.'" *Id.* at 22 (alteration in original).

In the third Supreme Court decision, *Arizona State Legislature v. Arizona Independent Redistricting Commission*, Arizona voters approved an initiative that would strip the Arizona state legislature of its authority to draw district lines. 576 U.S. at 792. The Arizona state legislature sued in federal court seeking to enjoin the use of the newly drawn legislative district maps. *Id.* The Supreme Court agreed with the special district court that the state legislature had standing. *Id.* at 793. In particular, the Supreme Court relied on the fact that the state legislature was "an institutional plaintiff asserting an institutional injury, and [the plaintiff] commenced this action after authorizing votes in both of its chambers." *Id.* at 802. The Supreme Court contrasted the situation in *Arizona State Legislature* with that in *Raines* where the plaintiffs were individual members but "[t]he 'institutional injury' at issue . . . scarcely zeroed in on any individual Member." *Id.* Additionally, the Supreme Court noted, the voter initiative "would 'completely nullif[y]' any vote by the Legislature, now or 'in the future,'" as the state senators' votes were nullified in *Coleman*. *Id.* at 804 (alteration in original) (quoting *Raines*, 521 U.S. at 823–24). In sum, the Arizona state legislature had

standing because "there was no mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned" authority. *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019).

Finally, we reach *Virginia House of Delegates v. Bethune-Hill*, which was released after the district court's opinion in this case. In *Bethune-Hill*, voters sued the state alleging that its districts, drawn after the 2010 census, were racially gerrymandered. *Id.* at 1949–50. The Virginia House of Delegates intervened as defendants. *Id.* at 1950. A special three-judge district court enjoined the use of the new districts because "the [S]tate ha[d] [unconstitutionally] sorted voters . . . based on the color of their skin." *Id.* (alterations and omission in original) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 180 (2018)). When Virginia's Attorney General declined to appeal, the House of Delegates did so. *Id.* The House of Delegates alleged that it had standing both on behalf of the state, *id.* at 1951–53, and on its own, *id.* at 1953–56. The Supreme Court swiftly dismissed the House of Delegates's allegation that it had standing on behalf of the state because the Attorney General was the only party authorized to represent the state. *Id.* at 1952.

The Supreme Court also held that the House of Delegates did not have standing on its own. *Id.* at 1953–56. The House of Delegates rested assertions of standing on "its role in enacting redistricting legislation in particular." *Id.* at 1953. But the Supreme Court noted that its "precedent . . . lends no support for the notion that one House of a bicameral legislature, resting solely on its role in the legislative process, may appeal on its own behalf a judgment invalidating a state enactment." *Id.* The Supreme Court also compared the House of Delegates's situation to that in *Arizona State Legislature* and

*Coleman*.  Because the entire bicameral General Assembly was granted the authority to redraw district lines, there was a "mismatch" between the party seeking to litigate, the House of Delegates, and the party with the constitutional authority, the General Assembly.  *Id.* at 1953–54.  "Just as individual members lack standing to assert the institutional interests of a legislature, a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole."  *Id.* (citations omitted).  Moreover, the Supreme Court distinguished *Coleman* because "this case does not concern the results of a legislative chamber's poll or the validity of any counted or uncounted vote."  *Id.* at 1954.

These four cases seemingly give rise to two important questions for analyzing legislative standing: First, did the defendant's action curtail the power and authority of the institution?  The authority of the Kansas Senate was curtailed by the tie-breaking vote of the Lieutenant Governor in *Coleman*.  So too was the power of the Arizona legislature curtailed by the voter initiative in *Arizona State Legislature*.  But the Virginia House of Delegates did not have its power curtailed when the General Assembly's redistricting was enjoined by a special three-judge district court.

Second, is there a mismatch between the entity pursuing litigation and the entity whose authority or right was curtailed?  In *Arizona* there was not.  In both *Bethune-Hill* and *Raines*, there was, as the plaintiff was attempting to vindicate the rights of another entity.

In addition to those two questions, our cases and the Supreme Court's additionally consider three other factors: the history of interbranch disputes in the courts, alternative political remedies available to the plaintiff, *see, e.g.*, *Raines*, 521 U.S. at 829 (considering whether litigating the dispute is

"contrary to historical experience" and whether Congress would have "an adequate remedy" without judicial intervention), and separation of powers, *Chenoweth*, 181 F.3d at 116–17. In none of the above decisions of the Supreme Court or this court was there ever an express determination of the first question before us: whether a single house of a bicameral legislature can ever have standing to litigate an alleged injury to its legislative prerogative distinct from the institutional standing of the entire legislature to litigate an institutional injury to the body as a whole. In *McGahn*, the en banc court considered that question in deciding an action brought on behalf of the House of Representatives to enforce a subpoena not involving the joinder of the Senate. The court answered the standing question with a resounding "yes."

We need not re-analyze what the en banc court so recently expounded. It suffices to note that the *McGahn* court spoke in conventional language of standing. In distinguishing *Bethune-Hill*, in which the Supreme Court had found no standing, from *McGahn*, in which there was standing, the en banc court explained that in *Bethune-Hill* the Supreme Court focused on the fundamental proposition that to effect standing, an injury must be particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *McGahn*, 968 F.3d at 766 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). In *Bethune-Hill* the alleged injury was to the Virginia legislature as a whole. The House of Delegates was not the injured party and therefore had no standing. In *McGahn*, the injury was particularized to the House of Representatives alone. Therefore, the en banc court found standing in the House to bring the litigation without the joinder of the Senate.

When the injury alleged is to the Congress as a whole, one chamber does not have standing to litigate. When the injury is

to the distinct prerogatives of a single chamber, that chamber does have standing to assert the injury. The allegations are that the Executive interfered with the prerogative of a single chamber to limit spending under the two-string theory discussed at the time of the founding. Therefore, each chamber has a distinct individual right, and in this case, one chamber has a distinct injury. That chamber has standing to bring this litigation.

As in *Arizona State Legislature*, the House is suing to remedy an institutional injury to its own institutional power to prevent the expenditure of funds not authorized. Taking the allegations of the complaint as true and assuming at this stage that the House is correct on the merits of its legal position, the House is individually and distinctly injured because the Executive Branch has allegedly cut the House out of its constitutionally indispensable legislative role. More specifically, by spending funds that the House refused to allow, the Executive Branch has defied an express constitutional prohibition that protects each congressional chamber's unilateral authority to prevent expenditures. It is therefore "an institutional plaintiff asserting an institutional injury" that is both concrete and particularized, belonging to the House and the House alone. *Arizona State Legislature*, 576 U.S. at 802.

To put it simply, the Appropriations Clause requires two keys to unlock the Treasury, and the House holds one of those keys. The Executive Branch has, in a word, snatched the House's key out of its hands. That is the injury over which the House is suing.

That injury—the snatched key—fits squarely within the *Lujan* mold because it is not a generalized interest in the power to legislate. Rather, the injury is concrete and particularized to the House and the House alone. The alleged Executive Branch

action cuts the House out of the appropriations process, rendering for naught its vote withholding the Executive's desired border wall funding and carefully calibrating what type of border security investments could be made. The injury, in other words, "zeroe[s] in" on the House. *Arizona State Legislature*, 576 U.S. at 802; *see also I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983) ("These provisions of Art. I are integral parts of the constitutional design for the separation of powers.").

Applying the "especially rigorous" standing analysis that the Supreme Court requires in cases like this, *Arizona State Legislature*, 576 U.S. at 803 n.12, reinforces the House's injury in fact. To hold that the House is not injured or that courts cannot recognize that injury would rewrite the Appropriations Clause. That Clause has long been understood to check the power of the Executive Branch by allowing it to expend funds only as specifically authorized. As then-Judge Kavanaugh wrote for this court, the Appropriations Clause is "a bulwark of the Constitution's separation of powers among the three branches of the National Government," and it "is particularly important as a restraint on Executive Branch officers." *U.S. Dep't of Navy v. Fed. Lab. Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).

The ironclad constitutional rule is that the Executive Branch cannot spend until both the House and the Senate say so. "However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion." *Reeside v. Walker*, 52 U.S. (11 How.) at 291. The Appropriations Clause even "prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority." *U.S. Dep't of Navy*, 665 F.3d at 1347

(citing *Off. Pers. Mgmt. v. Richmond*, 496 U.S. 414, 416 (1990), and *U.S. Dep't of Air Force v. Fed. Lab. Rel. Auth.*, 648 F.3d 841, 845 (D.C. Cir. 2011)).

But under the defendants' standing paradigm, the Executive Branch can freely spend Treasury funds as it wishes unless and until a veto-proof majority of both houses of Congress forbids it. Even that might not be enough: Under the defendants' standing theory, if the Executive Branch ignored that congressional override, the House would remain just as disabled to sue to protect its own institutional interests. That turns the constitutional order upside down. *Cf. Chadha*, 462 U.S. at 958 ("[T]he carefully defined limits on the power of each Branch must not be eroded."). The whole purpose of the Appropriations Clause's structural protection is to deny the Executive "an unbounded power over the public purse of the nation," and the power to "apply all its monied resources at his pleasure." *U.S. Dep't of Navy*, 665 F.3d at 1347 (quoting 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342, at 213–14 (1833)); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (noting the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department").

Nor does it work to say that suit can only be brought by the House and Senate together, as that ignores the distinct power of the House alone not to untie its purse string. "[*E*]*ach* Chamber of Congress [possesses] an *ongoing* power—to veto certain Executive Branch decisions—that each House could exercise independent of any other body." *Bethune-Hill*, 139 S. Ct. at 1954 n.5. Unlike the affirmative power to pass legislation, the House can wield its appropriations veto fully and effectively all by itself, without any coordination with or cooperation from the Senate. *Cf. McGahn*, 968 F.3d at 768.

For that reason, expenditures made without the House's approval—or worse, as alleged here, in the face of its specific disapproval—cause a concrete and particularized constitutional injury that the House experiences, and can seek redress for, independently.  And again, failure to recognize that injury in fact would fundamentally alter the separation of powers by allowing the Executive Branch to spend any funds the Senate is on board with, even if the House withheld its authorizations.

In short, Article III's standing requirement is meant to preserve not reorder the separation of powers.

In that way, this case bears no resemblance to *Bethune-Hill*.  The House of Representatives seeks to vindicate a legal interest that it possesses completely independently of the Senate, or of the Congress as a whole.  The Constitution's structure and the Appropriations Clause together give the House a vital power of its own:  "[N]ot a dollar . . . can be used in the payment of any thing" unless the House gives its "sanction[]." *Reeside*, 52 U.S. (11 How.) at 291.  That is quite different from an effort by one legislative chamber to enforce rights that vest solely in the full "legislature as a whole." *Bethune-Hill*, 139 S. Ct. at 1953–54.

The claims of the House under the Administrative Procedure Act warrant little separate discussion.  Those allegations in no way set forth a legislative injury distinct to the House of Representatives and affording it standing.  This court has explained that Congress does not have standing to litigate a claim that the President has exceeded his statutory authority. *See, e.g., Campbell*, 203 F.3d at 22–24.  Once a statute is passed, a claim that the Executive is exceeding his statutory authority is a generalized grievance and not particular to the body (or part of the body) that passed the law. *See, e.g.*,

*Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (explaining that citizens who stewarded a ballot initiative through the electoral process did not have particularized injury to sue after it was passed); *Lujan*, 504 U.S. at 575–76 ("[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable . . . ."). Both of these cases deal with private individuals as opposed to a house of Congress, but the logic translates to Congress as well.

## CONCLUSION

The judgment of the district court insofar as it dismisses the Administrative Procedure Act claims is affirmed. Insofar as the judgment dismisses the constitutional claims, it is vacated and remanded for further proceedings consistent with this decision.